# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **ALLEN BRIDGERS,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:07cv00479 |
| | § | |
| | § | *** DEATH PENALTY CASE *** |
| | § | |
| **NATHANIEL QUARTERMAN**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

## SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS
_____

## THIS IS A DEATH PENALTY CASE

David R. Dow
Texas Bar No. 06064900

Jared Tyler
Texas Bar No. 24042073

TEXAS DEFENDER SERVICE
412 Main St., Suite 1150
Houston, Texas 77002
TEL: (713) 222-7788
FAX: (713) 222-0260

Counsel for Allen Bridgers

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

TABLE OF EXHIBITS ............................................................................................... v

SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS ................................. 1

I.      JURISDICTION ................................................................................................ 1

II.     PRIOR PROCEEDINGS ................................................................................... 2

III.    FEDERAL REVIEW OF MR. BRIDGERS'S ATKINS CLAIM IS *DE NOVO* ............... 3

IV.    MR. BRIDGERS'S DEATH SENTENCE VIOLATES THE EIGHTH AND
        FOURTEENTH AMENDMENTS BECAUSE HE IS A MENTALLY
        RETARDED PERSON ....................................................................................... 4

      A.     The Mental Retardation Standard ........................................................... 4

      B.     The Stereotype, Stigma, and Reality of Mild Mental Retardation .......... 7

      C.     Allen Bridgers Is Mentally Retarded ..................................................... 16

             1.     Evidence of Impairments in Intellectual Functioning................ 17

                  a.     WAIS-IV (December 18, 2008)................................... 17
                  b.     WAIS-R (March 31, 1998) .......................................... 18
                  c.     WAIS-R (May 19, 1998) ............................................. 21
                  d.     Culture Fair (ca. 1993-1995)....................................... 22
                  e.     WISC-R (1981)............................................................ 24

             2.     Evidence of Significant Limitations in Adaptive Behavior ....... 26

                    a.     Conceptual Skills ........................................................ 26
                    b.     Social Skills ................................................................ 31
                    c.     Practical Skills ............................................................ 39

              3.     Expert Opinion ......................................................................... 47

      D.     The Presence of Risk Factors and Other Indicia of Reliability Confirm
            That Mr. Bridgers Is a Person with Mental Retardation ........................ 49

              1.     Biomedical Risk Factors ........................................................... 50

               2.     Social Risk Factors ................................................................... 51

3.       Behavioral Risk Factors ............................................................................55

4.       Educational Risk Factors ...........................................................................55

E.      Courts Have Granted *Atkins* Relief to Petitioners with Qualitatively Indistinguishable Evidence ...................................................................................57

CONCLUSION AND PRAYER FOR RELIEF .............................................................63

VERIFICATION      ..................................................................................................64

CERTIFICATE OF SERVICE .......................................................................................64

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Atkins v. Virginia*,
    536 U.S. 304 (2002)................................................................................ 1, 3, 4-5
*Briseno, Ex parte*,
    135 S.W.3d 1 (Tex. Crim. App. 2004)...................................................4, 20, 21
*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)............................................................................................ 7-8
*Ford v. Wainwright*,
    477 U.S. 399 (1986)..............................................................................................3
*Green v. Johnson*,
    No. 2:05cv340, 2007 WL 951686, 2007 U.S. Dist. LEXIS 21711
    (E.D. Va. Mar. 26, 2007) ............................................................................. 20-21
*Howell v. State*,
    151 S.W.3d 450 (Tenn. 2004)............................................................................17
*Modden, Ex parte*,
    147 S.W.3d 293 (Tex. Crim. App. 2004).........................................5, 18, 20, 21
*Moore v. Quarterman*,
    491 F.3d 213 (5th Cir. 2007) .............................................................................17
*Panetti v. Quarterman*,
    551 U.S. 930, 127 S.Ct. 2842 (2007).................................................................3
*People v. Superior Court*,
    155 P.3d 259 (Cal. 2007) ...................................................................................21
*Rivera v. Dretke*,
    No. B-03-139, 2006 WL 870927 (S.D.Tex. Mar. 31, 2006) ................................ 16, 57-59
*Rivera v. Quarterman*,
    505 F.3d 349 (5th Cir. 2007) .........................................................................3, 16
*Thomas v. Allen*,
    ___ F.Supp.2d ___, 2009 WL 1353722 (N.D. Ala. Apr. 21, 2009) ..................20
*United States v. Davis*,
    ___ F.Supp.2d, ___, 2009 WL 1117401, 2009 U.S. Dist. LEXIS 34707
    (D. Md. Apr. 24, 2009) ........................................................... 16, 17, 20, 59-61
*United States v. Parker*,
    65 M.J. 626 (N-M. Ct. Crim. App. 2007) ........................................................20
*United States v. Shields*,
    No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) ................................. 16, 20, 61-62
*Walker v. True*,
    399 F.3d 315 (4th Cir. 2005) .............................................................................20

TABLE OF EXHIBITS

| Exhibit | Document |
|---------|----------|
| 1 | AAIDD, USER'S GUIDE: MENTAL RETARDATION, DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS—10TH EDITION 20-21 (2007) (excerpt) |
| 2 | Angeline M. Jacobs, *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed., Garland STPM Press 3d ed. 1979) (excerpt) |
| 3 | Robert B. Edgerton, THE CLOAK OF COMPETENCE (Univ. of Cal. Press Rev. Updated 1993) (excerpt) |
| 4 | Report of Dr. Gilbert Martinez, Jan. 5, 2009 |
| 5 | Affidavit of Mark Cunningham, Ph.D., ABPP, July 17, 2006 |
| 6 | TDCJ records excerpt |
| 7 | Portsmouth Public School records |
| 8 | Norfolk Public School records |
| 9 | Virginia Beach Public Schools records |
| 10 | Eastern State Hospital records |
| 11 | Declaration of William Bridgers, III, Apr. 28, 2009 |
| 12 | Declaration of Harry Bridgers, Sr., Apr. 20, 2009 |
| 13 | Sentara-Norfolk Hospital records |
| 14 | DePaul Medical Center records |
| 15 | Declaration of Dwight Bridgers, Apr. 24, 2009 |
| 16 | Social Security Administration records |
| 17 | Declaration of Daniel J. Reschly, Ph.D., May 20, 2009 |
| 18 | 2002 AAMR Manual excerpt |
| 19 | Norfolk Public Schools records relating to biological father |

20        Declaration of Marie Bridgers, Apr. 26, 2009

21        Memorandum Opinion and Order, *Rivera v. Dretke*, No. B-03-cv-00139, at *39 (S.D. Tex. Mar. 31, 2006)

22        Affidavit of Stephen R. Gilliland, M.S., L.P.C., filed as Exhibit G to Respondent's Answer to Petitioner's Post-Show Cause Hearing Brief, *Rivera v. Dretke*, No. B-03-cv-00139

23        *United States v. Davis*, ___ F.Supp.2d, ___, 2009 WL 1117401, at *20, 2009 U.S. Dist. LEXIS 34707, at *60 (D. Md. Apr. 24, 2009)

24        Order Granting Defendant's Motion for Pretrial Determination of Mental Retardation, at 25, *United States v. Shields*, No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) (Docket Entry 557)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **ALLEN BRIDGERS,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:07cv00479 |
| | § | |
| | § | *** DEATH PENALTY CASE *** |
| | § | |
| **NATHANIEL QUARTERMAN**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

## SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS
_____

Petitioner Allen Bridgers asks this Court to issue a writ of habeas corpus and grant him relief from his unconstitutional death sentence. Because he is mentally retarded, his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution, *Atkins v. Virginia*, 536 U.S. 304 (2002), and he is entitled to federal habeas relief.

## I.     JURISDICTION

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Bridgers was convicted in the 114th Judicial District Court in Smith County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## II.    PRIOR PROCEEDINGS

Mr. Bridgers was convicted of capital murder and sentenced to death in 1998.   The conviction and death sentence were affirmed by the Texas Court of Criminal Appeals on October 25, 2000. *State v. Bridgers*, No. AP-73,112 (Tex. Crim. App. 2000) (unpublished).   The conviction became final on May 14, 2001, when the United States Supreme Court denied Mr. Bridgers's petition for writ of *certiorari*.  *Bridgers v. Texas*, 532 U.S. 1034 (2001).

Mr. Bridgers filed an application for writ of habeas corpus in the state convicting court on December 29, 1999.   The convicting court recommended that relief be denied and the Texas Court of Criminal Appeals accepted the recommendation, denying relief on May 31, 2000.  *Ex parte Bridgers*, No. WR-45,179-01 (Tex. Crim. App. 2000) (unpublished).  On April 15, 2002, Mr. Bridgers filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Texas. The district court denied relief on March 30, 2005, granting a certificate of appealability on one claim. The United States Court of Appeals for the Fifth Circuit denied relief on December 2, 2005.  *Bridgers v. Dretke*, 431 F.3d 853 (5th Cir. 2005).  The United States Supreme Court then denied Mr. Bridgers's petition for writ of *certiorari* on June 26, 2006. *Bridgers v. Quarterman*, No. 05-10062, ___ U.S. ___, 2006 WL 1725134 (2006).

On July 18, 2006, Mr. Bridgers filed a subsequent application for writ of habeas corpus in state court alleging that Mr. Bridgers's death sentence was unconstitutional because he had mental retardation and providing *prima facie* evidence in support thereof.   Mr. Bridgers alleged a second claim that, because of the retroactive nature of *Atkins*, he was entitled to due process and the tools necessary for an opportunity to meaningfully litigate his mental retardation claim. The Court of Criminal Appeals remanded the cause to the trial court for consideration of the

merits of Mr. Bridgers's claims. That application was denied by the Texas Court of Criminal Appeals on September 12, 2007.

## III.    FEDERAL REVIEW OF MR. BRIDGERS'S *ATKINS* CLAIM IS *DE NOVO*.

Once a state court decision has been determined to have been unreasonable, a federal court considers the claim absent any AEDPA deference. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 2858 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); *Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2007) ("As the CCA's decision was an unreasonable application of federal law, the district court did not err by considering Rivera's claim without deference to it."). This Court has already determined that the State's failure to provide the procedures mandated by *Ford v. Wainwright*, 477 U.S. 399 (1986), *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842 (2007), constituted an unreasonable application of clearly established law as determined by the Supreme Court. *See* Order Granting Motion to Determine Whether 2254(d) Has Been Satisfied, at 4 (Docket Entry 30). Consequently, review in this Court is unencumbered by AEDPA deference and review of his federal constitutional claim is *de novo*.[1]

---

[1] In view of this holding, and in the interest of economy, Mr. Bridgers has omitted from this second amended petition his arguments relating to 28 U.S.C. § 2254(d) that he made in his first amended petition. *See* First Amended Petition for Writ of Habeas Corpus, at 34-73 (Docket Entry 22). To the extent that those arguments are relevant to any issue that may remain in this proceeding, however, Mr. Bridgers hereby incorporates them by reference.

**CLAIM FOR RELIEF**

**IV.** **MR. BRIDGERS'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS A MENTALLY RETARDED PERSON.**

**A.** **The Mental Retardation Standard.**

The execution of a mentally retarded person violates the Eighth Amendment's proscription against cruel and unusual punishment. *Atkins*, 536 U.S., at 321.

The Texas Legislature has not provided a statutory definition of mental retardation. In the absence of such a statutory definition, it is appropriate for this Court in assessing whether a *prima facie* case has been made to rely on the definitions set out by the American Association of Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").[2] *Ex parte Briseno*, 135 S.W.3d 1, 5-8, 14 (Tex. Crim. App. 2004). Each organization recognizes that mental retardation is a disability characterized by (1) "significantly subaverage" (APA) or "significant limitations" in (AAMR) intellectual functioning, (2) accompanied by "significant limitations" in adaptive behavior, (3) the onset of which occurs prior to the age of 18. *See* AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002) [hereinafter 2002 AAMR Manual]; APA, *Diagnostic and Statistical Manual of Mental Disorders* 41 (Text Revision, 4th ed. 2000) [hereinafter DSM-IV]; *Briseno*, 135 S.W.3d, at 7.

Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below, or approximately two standard deviations below the mean. *Briseno*, 135 S.W.3d, at 7 n.24 (citing DSM-IV at 39). However, both the AAMR Manual and the DSM-IV take into

---

[2] The AAMR is now called the American Association on Intellectual and Developmental Disabilities ("AAIDD"). Mr. Bridgers will use AAMR to refer to the manual published under that name, but will use AAIDD to refer to the organization itself and publications published under the new name.

account the standard error of measurement in assessing IQ (approximately 5 points), which, in effect, "expands the operational definition of mental retardation to 75." 2002 AAMR Manual at 58-59; DSM-IV-TR at 41-42. *See also Atkins*, 536 U.S., at 309 n.5 (score of 75 is typically considered the cutoff IQ score for the intellectual functioning prong of the mental retardation definition); *Ex parte Modden*, 147 S.W.3d 293, 298 (Tex. Crim. App. 2004) (70-75 IQ score "generally indicates subaverage general intellectual functioning"). Additionally, the AAIIDD User's Guide to the 2002 AAMR Manual recommends that clinicians take the Flynn effect, discussed *infra*, into account when interpreting IQ scores and assessing intellectual functioning. *See* AAIDD, USER'S GUIDE: MENTAL RETARDATION, DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS—10TH EDITION 20-21 (2007) [hereinafter AAIDD User's Guide] (excerpt attached as Exhibit 1).

The AAMR Manual requires that there be "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical skills." 2002 AAMR Manual at 1. "Significance" can be established by the limitations in one of the three domains. *Id*., at 74, 77-78. The AAMR Manual provides examples of "representative skills" in each of the three domains. Representative **conceptual skills** are "language, reading and writing, money concepts, and self-direction." *Id*. at 82. Representative **social skills** are "interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, avoids victimization." *Id*. Representative **practical skills** are "activities of daily living, instrumental activities of daily living, occupational skills, and maintains safe environments." *Id*. The APA definition requires that there be "significant limitations" in at least two of the following eleven domains:

- communication
- self-care
- home living
- social/interpersonal skills

- use of community resources
- self-direction
- health
- safety
- functional academics
- leisure
- work

DSM-IV-TR, at 41.[3]

---

[3] The AAIDD and APA adaptive behavior domains are consistent with each other. Prior to the present edition of the 2002 AAMR Manual, the 1992 AAMR Manual (9th ed.1992) utilized a description of adaptive behavior domains similar to the description of the eleven domains still utilized by the APA in the DSM-IV. The only differences were the APA domain "social/interpersonal skills" was called "social skills" in the 1992 AAMR Manual; the APA domain "use of community resources" was called "community use" in the 1992 AAMR Manual; and the two APA domains, "health" and "safety" were combined into a single "health and safety" domain in the 1992 AAMR Manual. *See* AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (9th ed. 1992) [hereinafter 1992 AAMR Manual]. Although the 2002 AAMR Manual shifted from a focus upon ten domains to three broader domains of adaptive behavior, each of the ten 1992 skill areas fits neatly within at least one 2002 AAMR Manual domain:

### Relationships of 1992 and 2002 Adaptive Behavior Skills

| Adaptive Behavior Skill Areas in 2002 Definition | Representative Skills in 2002 Definition | Skill Areas Listed in 1992 Definition |
|---|---|---|
| Conceptual | Language<br>Reading and Writing<br>Money concepts<br>Self-direction | Communication<br>Functional academics<br>Self-direction<br>Academics |
| Social | Interpersonal<br>Responsibility<br>Self-esteem<br>Gullibility<br>Naiveté<br>Follows rules<br>Obeys laws<br>Avoid victimization | Social skills<br>Leisure |

**B. The Stereotype, Stigma, and Reality of Mild Mental Retardation.**

Steinbeck's Lennie may be the popular conception of a mentally retarded person, but it is not an accurate representation of mental retardation, at least not for the approximately 85-89% of all mentally retarded persons who suffer from "mild" mental retardation. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 443 n.9 (1985) ("Mentally retarded individuals fall into four distinct categories. The vast majority—approximately 89%—are classified as 'mildly' retarded, meaning that their IQ is between 50 and 70. Approximately 6% are 'moderately' retarded, with IQs between 35 and 50. The remaining two categories are 'severe' (IQs of 20 to 35) and 'profound' (IQs below 20)."); DSM-IV at 41 (85% of those officially categorized as mentally retarded are classified as mild). Many lay persons labor under a profound misconception of persons with mental retardation, especially mild mental retardation. This conception fails to take into account "the wide variation in the abilities … of the retarded," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985), and is, ultimately, based on a stereotype—including the "false stereotype that all [are] ineducable," *Id*. at 463 (Marshall, J., dissenting)—that, if acted on by courts of law, would arbitrarily exclude from *Atkins's* protection the great majority of persons who are categorically mentally retarded.

| Practical | Activities of daily living Instrumental activities of daily living Occupational skills Maintains safe environments | Self-care Home living Community use Health and safety Work |
|---|---|---|

2002 AAMR Manual, Table 5.2. Thus, the current AAMR and APA domains are likewise compatible.

As *City of Cleburne* Court noted, although it "is undeniable … that those who are mentally retarded have a reduced ability to cope with and function in the everyday world," the mentally retarded nonetheless "range from those whose disability is not immediately evident to those who must be constantly cared for."  473 U.S. at 442.  The class of mildly mentally retarded are most likely to contain those mentally retarded persons "whose disability is not immediately evident."  With respect to the class of mildly mentally retarded persons, the DSM-IV states,

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." … As a group, people with this level of Mental Retardation typically develop ***social and communication skills*** during the preschool years (ages 0-5 years), have ***minimal impairment in sensorimotor areas***, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve ***social and vocational skills adequate for minimum self-support***, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV at 43.  The *Manual of Diagnosis and Professional Practice in Mental Retardation*, prepared by the American Psychiatric Association, describes this class of the mentally retarded in more detail:

> People classified with mild MR evidence small delays in the preschool years but often are not identified until after school entry, when assessment is undertaken following academic failure or emergence of behavior problems.  Modest expressive language delays are evident during early primary school years, with the use of 2- to 3- word sentences common.  During the later primary school years, these children develop ***considerable*** expressive speaking skills, ***engage with peers in spontaneous interactive play***, and can be guided into play with larger groups.  During middle school, they develop ***complex*** sentence structure, and their speech is ***clearly intelligible***.  The ability to use simple number concepts is also present, but practical understanding of the use of money may be limited.  By adolescence, ***normal language fluency*** may be evident.  Reading and number skills will range from 1st- to 6th-grade level, and social interests, community activities, and self-direction will be typical of peers, albeit as affected by pragmatic academic skill attainments.  Baroff (1986) ascribed a mental age range of 8 to 11 years to adults in this group.  This designation implies variation in

academic skills, and for a large proportion of these adults, persistent low academic skill attainment limits their vocational opportunities.  However, ***these people are generally able to fulfill all expected adult roles***.  Consequently, their involvement in adult services and participation in therapeutic activities following completion of education preparation is relatively uncommon, is often time-limited or periodic, and may be associated with issues of adjustment or disability conditions not closely related to MR.[4]

---

[4] By way of contrast, the DSM-IV characterizes moderate, severe, and profound mental retardation as follows:

**Moderate** Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "trainable."  This outdated term should not be used because it wrongly implies that people with Moderate Mental Retardation cannot benefit from educational programs.  This group constitutes about 10% of the entire population of people with Mental Retardation.  Most of the individuals with this level of Mental Retardation acquire communication skills during early childhood years.  They profit from vocational training and, with moderate supervision, can attend to their personal care.  They can also benefit from training in social and occupational skills but are unlikely to progress beyond the second-grade level in academic subjects.  They may learn to travel independently in familiar places.  During adolescence, their difficulties in recognizing social conventions may interfere with peer relationships.  In their adult years, the majority are able to perform unskilled or semiskilled work under supervision in sheltered workshops or in the general workforce.  They adapt well to life in the community, usually in supervised settings.

The group with **Severe** Mental Retardation constitutes 3%-4% of individuals with Mental Retardation.  During the early childhood years, they acquire little or no communicative speech.  During the school-age period, they may learn to talk and can be trained in elementary self-care skills.  They profit to only a limited extent from instruction in pre-academic subjects, such as familiarity with the alphabet and simple counting, but can master skills such as learning sight reading of some "survival" words.  In their adult years, they may be able to perform simple tasks in closely supervised settings.  Most adapt well to life in the community, in group homes or with their families, unless they have an associated handicap that requires specialized nursing or other care.

The group with **Profound** Mental Retardation constitutes approximately 1%-2% of people with Mental Retardation.  Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation.  During the early childhood years, they display considerable impairments in sensorimotor functioning.  Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver.  Motor development and self-care and communication skills may

American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* 17-18 (John W. Jacobson and James A. Mulick eds., 1996) (emphasis supplied) [hereinafter "APA Manual"].

People with mild mental retardation are capable of living remarkably meaningful and fulfilling lives, including the capacity to live independently, to work, and to marry and have families. One recent British study that surveyed persons with intellectual functioning in the mild mental retardation range found that, "[a]lthough the mild intellectual impairment group were less likely to attain the following social outcomes than people with normal intellectual functioning, 67% had jobs, 73% were married, 62% had children and 54% owned their own homes. 12% participated in adult education." I. Hall, *et. al.*, *Social Outcomes in Adulthood of Children with Intellectual Impairment: Evidence from a Birth Cohort*, 49 J. INTELL. DISABILITY RES. 171 (2005).

With respect to employment, mildly mentally retarded people often have adaptive deficits related to their occupational skills, but many are nevertheless able to seek, obtain, and even maintain work. Indeed, employment is the norm among mildly mentally retarded persons. While members of this class typically hold lower-level, manual, and lesser-paying jobs than non-mentally retarded persons, the jobs that they perform are nonetheless varied. A handbook regarding "job placement of mentally retarded adults who are preparing for independent living

---

improve if appropriate training is provided. Some can perform simple tasks in closely supervised and sheltered settings.

DSM-IV at 43-45 (emphasis supplied).

and competitive employment" lists many kinds of employment that mentally retarded persons satisfactorily perform, including:

- Library Assistant;
- Typist;
- Waiter/Waitress;
- Landscaping Worker;
- Painting and Maintenance Worker;
- Sewing Machine Operator;
- Forklift Operator; and
- Factory Equipment Cleaner

Angeline M. Jacobs, *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed., Garland STPM Press 3d ed. 1979) (excerpts attached as Exhibit 2).

In his seminal book, *The Cloak of Competence*, first published in 1967, Dr. Robert Edgerton collected detailed data and information on 48 persons who had been diagnosed with mental retardation and who had been released without restriction from an institution. The original group of 110 persons identified as having been released from the hospital had a mean IQ of 64, thirteen of which, despite having been diagnosed as mentally retarded, had IQs measuring higher than 70. Robert B. Edgerton, THE CLOAK OF COMPETENCE 8-11 (Univ. of Cal. Press Rev. Updated 1993). Dr. Edgerton discussed some of the individuals in the study in detail, including "Fred," about whom Dr. Edgerton wrote:

> Before beginning his present job Fred had a varied and moderately successful work career. After leaving [the hospital], he held a number of jobs in sanitariums, involving the usual kitchen and janitorial work. He also scrubbed and waxed floors, something which he says he did well. He held one of these jobs for close to six years and was a reasonably adequate worker on the others. As Fred puts it: "Well, sometimes you get tired of the same thing and you want to get something else. You quit, or you keep looking until you find a place you like. My problem has been quitting jobs. They don't fire me. You can see my record. I got a good record behind me." In general, what Fred says is true: he quits jobs; he is not fired. He has also worked as a dishwasher in several downtown slum-area or

skid-row restaurants. But for the two years prior to his present job, Fred's employment consisted only of odd jobs for persons who had befriended him.

One friend whom Fred describes as a "big shot with a great big house" offered him occasional jobs of gardening, as did his former social worker, who has kept in touch with him throughout the years. Every weekend Fred would get on a bus downtown and ride to the homes of these "friends" in the suburbs. His former social worker would pay his bus fare and give him five dollars for an afternoon's work of painting, cleaning up, or gardening.

*Id*. at 42-43 ("Fred's" complete profile is attached as Exhibit 3). Of all the 48 persons Dr. Edgerton was able to make contact with, he found that "relatively few of the ex-patients are unemployed," although most were "highly marginal economic earners."[5] *Id*. at 102.

---

[5] The AAIDD position statement on employment states:

All of our constituents should be prepared for careers and have the opportunity for jobs alongside non-disabled workers based upon their preferences, interests, and strengths.

Employment Opportunities Should Include:

- Ongoing career planning, job advancement, and retirement planning.
- Flexible and comprehensive individualized supports to ensure the person's employment success.
- Wages and benefits that are fair and reasonable.
- Micro-enterprises or small businesses.

Employment Preparation Should Include:

- Instruction regarding principles of career development and social skill development, starting in the early grades and continuing through graduation.
- General and specific job skill training and actual paid work experiences in the community.
- A comprehensive plan for transition to adult life.
- Training in how to travel in the community so they can get to different jobs and enhance their independence.

In addition, employed individuals must have the opportunity for continued education or specialized training to enhance their marketability and to help them advance in careers or chosen areas of interest.

With respect to marriage and parenting, while mentally retarded persons, as a group, marry less frequently than non-mentally retarded persons, they do indeed fall in love and marry, often to persons who do not themselves have mental retardation; moreover, "the marriages of almost half the mildly retarded young women appeared to be working out well," and "retarded young men were not significantly different from nonretarded comparisons." H. Koller, *et. al., Marriage in a Young Adult Mentally Retarded Population*, 32 J. MENTAL DEFICIENCY RES. 93 (1988); s*ee also id*. at 97 (89% of the married mildly mentally retarded persons in study married a person who was *not* mentally retarded); B. Maughan, *et. al.*, *Mild Mental Retardation: Psychosocial Functioning in Adulthood*, 29 PSYCHOL. MED. 351, 359 (reflecting that 79.5% of mildly mentally retarded adult men reported having been "in a stable cohabitation" by age 33); Edgerton at 104 (finding that 71% of the 48-person cohort he studied were or had been married at the time the interviews were conducted, and 53% of those to people who were not themselves mentally retarded) (excerpt attached as Exhibit 3). However, as can be expected, "marriages in which **both** partners were retarded had many problems." H. Koller at 93 (emphasis supplied). With respect to child-rearing, "Mental retardation does not by itself establish the inability to parent." Douglas S. Diekema, *Involuntary Sterilization of Persons with Mental Retardation: An Ethical Analysis*, 9 MENTAL RETARDATION & DEV. DISABILITIES RES. REVS. 21, 24 (2003). Indeed, because involuntary sterilization of the mentally retarded came into disrepute several decades ago, many mentally retarded persons have children, and it has become common enough that it has generated significant scientific study, particularly with respect to improving the quality of care mentally retarded persons can give their children. As one review of the scientific

AAIDD/ARC Position Statements, Employment, available at:
http://www.aaidd.org/content_148.cfm (last visited May 20, 2009).

literature on parenting by the mentally retarded discovered, many studies concluded that, despite

problems, "the majority of parents labeled mentally retarded were providing adequate care."[6]

---

[6] In line with this understanding of the true capacities of mentally retarded persons, the AAIDD position statement regarding sexuality holds:

> Every person has the right to exercise choices regarding sexual expression and social relationships. The presence of mental retardation and related developmental disabilities, regardless of severity, does not, in itself, justify loss of rights related to sexuality.

> All people have the right within interpersonal relationships to:

> - Develop friendships and emotional relationships where they can love and be loved and start and stop the relationships as they choose.
> - Dignity and respect.
> - Privacy, confidentiality, and freedom of association.

> With respect to sexuality, individuals have a right to:

> - Sexual expression, reflective of age, social development, cultural and moral values, and social responsibility.
> - Information to allow informed decisions, including sex education about such issues as safe sexual practices, sexual orientation, sexual abuse, and sexually transmitted diseases.
> - Protection from sexual harassment as well as from physical, sexual, and emotional abuse and sexual relationships with paid staff.
> - Have sexual relationships, including marriage, with individuals of their choice. …

> With respect to the potential for having and raising children, they have the right to:

> - Choices related to birth control, including the decision to have and raise children, with supports if necessary; to accept personal responsibility for these decisions; and to have control over their own bodies.
> - Have, on an individual basis, access to the proper supports to assist them in raising their children within their own home.
> - Choose for themselves whether or not to be sterilized, regardless of the severity of their mental retardation."

AAIDD/ARC Position Statements, Sexuality, available at: http://www.aaidd.org/content_154.cfm (last visited May 20, 2009).

Maurice A. Feldman, *Research on Parenting by Mentally Retarded Persons*, 9 PSYCH. CLINICS OF NORTH AMERICA 777, 782 (1986). *See also* Maughan, at 359 (reflecting that 63.4% of mildly mentally retarded adult men had at least one child by age 33).

Finally, it is exceedingly important to understand the great stigma that is associated with a diagnosis of mental retardation, a stigma that, despite their impaired intellectual and social functioning, mentally retarded people can and do feel very deeply:

> To find oneself regarded as a mental retardate is to be burdened by a shattering stigma. Indeed, for the former patient [of a hospital for the mentally retarded], to be labeled as a mental retardate is the ultimate horror. They reject it with all their will. Their own words best indicate how the stigma weighs upon them.
>
> > (A woman) When I got out of that place it was horrible. I knew everybody was looking at me and thinking that it was true what they thought I was. I couldn't stand for people to think that about me. That's a terrible thing for people to think. Nobody could stand to have people thinking about them like that. That's why I started to take dope (heroin). I used to cry all the time because of what people were thinking about me, so my friend gave me this dope and said it would make me feel better. It did, too. I didn't worry about nothing while I was on. But that's the reason I started taking it—nobody could stand what those people were thinking.
>
> ***
>
> Words to the same effect were uttered by all but a few of the former patients in this study. For all of these persons, an admission of mental retardation is unacceptable—totally and without exception. … They employ almost any other excuse, from epilepsy to "craziness"—excuses that are themselves highly stigmatizing. Never is mental retardation admitted.[7]

Edgerton, *supra*, at 182-83 (excerpt attached as Exhibit 3). To help cope with this stigma, persons with mental retardation often assume a "cloak of competence," *i.e.*, an adoption of mannerisms and means of bluffing their way through the world to give an appearance of normalcy. One federal district court described this cloak of competency as the "powerful

---

[7] As will become apparent from the evidence in this case, for Mr. Bridgers and his family, "dyslexia"—as opposed to epilepsy or craziness—became the chosen excuse for Mr. Bridgers's mental retardation.

tendency of mildly mentally retarded people to mask or compensate for their deficits," as by making claims to having done and being able to do things they in fact have not and cannot competently do. *See United States v. Davis*, ___ F.Supp.2d, ___, 2009 WL 1117401, at *20, 2009 U.S. Dist. LEXIS 34707, at *60 (D. Md. Apr. 24, 2009).

The evidence Mr. Bridgers describes below and that he can produce at an evidentiary hearing proves by a preponderance of the evidence that he has mild mental retardation. The evidence, viewed holistically, paints a vivid picture of the tribulations of a person with mild mental retardation, particularly one who, having never been properly assessed and diagnosed as a child, fell through the cracks of our social safety net and thus lacked any social supports for his disability.[8]

### C.     Allen Bridgers Is Mentally Retarded.

Mr. Bridgers is mentally retarded. The evidence shows that: (1) his IQ, as reflected in the results of IQ tests administered to him, is significantly subaverage; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen.

---

[8] For analogous cases with evidence very similar to Mr. Bridgers in which federal district courts granted relief, *see United States v. Davis*, ___ F.Supp.2d, ___, 2009 WL 1117401, at *20, 2009 U.S. Dist. LEXIS 34707, at *60 (D. Md. Apr. 24, 2009) (attached as Exhibit 23); Order Granting Defendant's Motion for Pretrial Determination of Mental Retardation, at 25, *United States v. Shields*, No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) (Docket Entry 557) (attached as Exhibit 24); *Rivera v. Dretke*, No. B-03-139, 2006 WL 870927 (S.D.Tex. Mar. 31, 2006) (granting *Atkins* relief), *rev'd in part on other grounds*, *Rivera v. Quarterman*, 505 F.3d 349 (2007) (expressly upheld district court merits determination) (attached as Exhibit 21). *See also* Exhibit 3 (excerpt of life of Fred, a previously institutionalized mentally retarded person with a measured IQ in the 50's.)

### 1. Evidence of Impairments in Intellectual Functioning.

#### a. WAIS-IV (December 18, 2008).

On December 18, 2008, Dr. Gilbert Martinez, a psychologist, administered the Wechsler Adult Intelligence Scales—Fourth Edition ("WAIS-IV") to Mr. Bridgers. The WAIS-IV is the most recent, and therefore most reliable, iteration of the respected Wechsler Adult Intelligent Scales.[9] Prior to administering the WAIS-IV, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of Memory Malingering ("TOMM")—"to explore potential problems with response bias or intentional efforts to misrepresent cognitive symptomatology." Use of the TOMM is intended to determine whether the person being examined is putting forth full effort. According to Dr. Martinez's report, Mr. Bridgers obtained a full scale IQ score of 71, reflecting significantly subaverage intellectual functioning. *See* Exhibit 4 (Report of Dr. Gilbert Martinez, Jan. 5, 2009). *See also Davis*, 2009 WL 1117401, at *11-*12, 2009 U.S. Dist. LEXIS 34707, at *45 (full scale IQ score of 70 on WAIS-IV demonstrated significantly subaverage functioning). Furthermore, the results of the validity testing were "consistent with very good effort on cognitive testing"—the same results as when an expert for the State administered similar testing during prior proceedings. *See* E.H. Vol. 3: 65 (State's expert did not detect any malingering); *id*. at 66 (State expert's opinion that "his effort

---

[9] The Wechsler scales are comprehensive, cover both verbal and non-verbal domains, and are the "standard instrument in the U.S. for assessing intellectual functioning." *Moore v. Quarterman*, 491 F.3d 213, 232 n.7 (5th Cir. 2007) (Dennis, J., dissenting). *See also Howell v. State*, 151 S.W.3d 450, 469 (Tenn. 2004) (Drowota III, J., concurring and dissenting) (referring to Wechsler scales as "gold standard"). The WAIS-IV, specifically, was published only months before it was administered to Mr. Bridgers. As will be explained, *infra*, it is by far the most reliable intelligence test that has been administered to Mr. Bridgers.

was good"); *id.* at 112.[10]    According to Dr. Martinez, "There was no evidence for misrepresentation of cognitive or intellectual functioning."  Exhibit 4.

### b.    WAIS-R (March 31, 1998).

Prior to the beginning of the punishment phase in Mr. Bridgers's trial, the Court held a *Daubert* hearing outside the presence of the jury during which Dr. Mark Cunningham, a psychologist, testified that he administered the Wechsler Adult Intelligence Scales, Revised ("WAIS-R"), to Mr. Bridgers on March 31, 1998, on which he obtained a full-scale score of 73. S.F. Vol. 32: 20-21.  He further testified that a standard error of measurement of plus or minus four meant that the range of IQ scores between 69 and 77 contained Mr. Bridgers' true IQ score. *Id.; see also* E.H. Vol. 3: 30-31; Exhibit 5 at 3-4 (Affidavit of Mark Cunningham, Ph.D., ABPP, July 17, 2006).  This score, taking into account only the standard error of measurement, is within the cut-off IQ score to satisfy the first prong of the mental retardation criteria.  *See* E.H. Vol. 3: 67; *Briseno*, 135 S.W.3d at 5-8, 14, *Modden*, 147 at 298; 2002 AAMR Manual at 58-59.

When the accepted scientific phenomenon known as the "Flynn effect"—in which people are observed to perform better on intelligence tests over time as norms age—is taken into account, Mr. Bridgers' WAIS-R score reflects intellectual functioning that is even further below the mean.[11]  Flynn's empirical research has demonstrated that the average obtained by any given

---

[10] In this petition, "S.F. Vol. __: ___" will refer to the transcript of the trial proceedings. "E.H. Vol. __: ___" will refer to the transcript of the evidentiary hearing held in the state court regarding Mr. Bridgers' mental retardation claim.

[11] The AAIDD, formerly the AAMR and the organization whose mental retardation criteria the Texas Court of Criminal Appeals has ruled should be followed, has issued guidelines recommending that the Flynn effect be taken into account when undertaking retrospective analyses.  In a section entitled "Retrospective Diagnosis," The AAIDD User's Guide to the 2002 AAMR Manual states:

group on the Wechsler scales has historically increased by approximately 0.33 points per year. AAIDD USER'S GUIDE at 20-21; *Moore*, 491 F.3d at 232 n.7 (Dennis, J., dissenting). Thus, if a standardization sample took the WAIS-R in 1998, that group would have scored an average that was 6.6 points higher than the average scored by the standardization sample that was administered the WAIS-R in 1978 (20 years x 0.33 points = 6.6 points). Because the average score, from which standard deviations are measured, was set for this particular test at 100 in 1978, this means the average score of a standardization sample in 1998 would have been 106.6. Two standard deviations (30 points) below the 1998 average, *i.e.*, the approximate AAMR cut-off for mental retardation, would be 76.6, or, rounding up, 77.

Rather than expressing the Flynn effect by adjusting the mean *upward* and then recounting standard deviations to determine the mental retardation range, the Flynn effect may also be mathematically expressed simply by holding the mean steady and adjusting an individual score *downward* by the corresponding number of points. Flynn, James R., *The WAIS-III and WAIS-IV: Daubert Motions Favor the Certainly False over the Approximately True*, 16 Applied

---

The following guidelines for clinicians are important in retrospective diagnoses and complement those guidelines presented in the next section regarding situations in which formal assessment is less than optimal: … 4. **Recognize the "Flynn Effect."** … In cases where a test with aging norms is used, a correction for the age of the norms is warranted. For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn effect would be 103 in 2005 (9 years x 0.33 = 2.9). Hence, using the AAMR 2002 System, significant deficits in intellectual functioning of "at least two standard deviations below the mean" (Luckasson et al., 2002) the approximate Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

AAIDD USER'S GUIDE at 20-21; E.H. Vol. 3: 73-75.

Neuropsychology 98 ("Adjusting the IQ of an individual is no less or more accurate than adjusting the mean IQ of a group. How could it be? You use the same rate of obsolescence for both: you deduct 0.3 points for every year between the time of norming and the time of testing. If the rate is accurate, both adjustments are accurate."). This has the effect of maintaining the mean at the arbitrary but familiar number 100, while still accurately expressing how many standard deviations below the current mean the individual scored, which is the relevant inquiry for intellectual functioning in the mental retardation context. Mr. Bridgers will use this latter method of expressing the Flynn effect so as to maintain the familiar 75 as the approximate IQ score cut-off for mental retardation.[12] *See Briseno*, 135 S.W.3d at 5-8, 14, *Modden*, 147 at 298; 2002 AAMR Manual at 58-59.

---

[12] Many courts have relied upon and applied the Flynn effect in their assessments of intellectual functioning. *See, e.g., Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005) (reversing district court for, *inter alia*, failure to consider Flynn effect); *Davis*, 2009 WL 1117401, at *15, 2009 U.S. Dist. LEXIS 34707, at *44 ("[T]he Court finds the defendant's Flynn effect evidence both relevant and persuasive, and will, as it should, consider the Flynn-adjusted scores in its evaluation of the defendant's intellectual functioning."); Order Granting Defendant's Motion for Pretrial Determination of Mental Retardation, at 25, *United States v. Shields*, No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) (Docket Entry 557) ("The Flynn effect, which all the experts agreed does actually exist, refers to the observation that IQ scores are rising over time. … The Court concludes that the Flynn effect must be considered…"); *Thomas v. Allen*, ___ F.Supp.2d ___, 2009 WL 1353722, at *13 (N.D. Ala. Apr. 21, 2009) ("The steady rise in IQ scores from year to year is a statistically proven fact. … It also is undisputed that Professor Flynn's recommendation—i.e., 'deduct 0.30 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test'—is a generally accepted adjustment." (footnote omitted)); *id*. at *15 ("Contrary to respondent's argument that there is no diagnostic or legal basis by which this court may properly adjust petitioner's raw IQ scores in answering the question of whether he suffers from significantly subaverage intellectual functioning, the adjustments to raw IQ scores mandated by the 'standard error of measurement' and the 'Flynn effect' are well-supported by the accumulation of empirical data over many years." (footnote omitted)); *United States v. Parker*, 65 M.J. 626, 629-30 (N-M. Ct. Crim. App. 2007) ("In determining whether an offender meets [the AAMR] definition [of mental retardation], standardized IQ scores scaled by the SEM and the Flynn effect will be considered, along with evidence of the offender's adaptive functioning ability, and onset of the mental retardation before the age of 18."); *Green v. Johnson*, No. 2:05cv340, 2007 WL 951686, at *12, 2007 U.S. Dist. LEXIS 21711, at *41 (E.D. Va. Mar. 26, 2007) Magistrate Judge

Expressed in this way, Mr. Bridgers' score of 73 on the WAIS-R in 1998 is equivalent to his having scored 66 (73 – 6.6 = 66.4) where the mean is 100. When the standard error of measurement of plus or minus four points for the WAIS-R is considered, Mr. Bridgers' March 1998 WAIS-R score reflects an adjusted full-scale IQ score between 62 and 70. Accordingly, Mr. Bridgers' WAIS-R result is more than two standard deviations below the mean, is significantly subaverage, and represents significant limitations in intellectual functioning.

### c.    WAIS-R (May 19, 1998).

On May 19, 1998, following Mr. Bridgers' conviction and his transfer to the Texas Department of Criminal Justice ("TDCJ"), psychologist and TDCJ employee Dr. Michael Gilhousen administered two subtests of the WAIS-R to Mr. Bridgers, estimating therefrom his "full-scale" resulting score to be 75. *See* E.H. Vol. 3: 31; Exhibit 6 (TDCJ records excerpt). This score, absent any adjustment for the Flynn effect, is within the cut-off IQ score to satisfy the first prong of the mental retardation criteria. *See Briseno*, 135 S.W.3d at 5-8, 14, *Modden*, 147 at 298; 2002 AAMR Manual at 58-59. However, because this is the identical test that Dr. Cunningham administered to Mr. Bridgers and was administered in the same year, the Flynn effect adjustment is the same, *i.e.*, the appropriate mean from which to judge standard deviations is 106.6. Keeping the mean at 100 and adjusting Mr. Bridgers' estimated score of 75 downward by 6.6 points yields an adjusted score of 68 (75 – 6.6 = 68.4). This adjusted score is more than two standard deviations below the mean, is significantly subaverage, represents significant

---

properly took Flynn effect into account during analysis of intellectual functioning); *People v. Superior Court*, 155 P.3d 259, 855-56 (Cal. 2007) (state trial court applied Flynn effect).

limitations in intellectual functioning, and confirms the testing administered by Dr. Mark Cunningham in March of 1998.[13]

### d.    Culture Fair (ca. 1993-1995).

Mr. Bridgers is aware of two other known intelligence test administrations. While incarcerated in prison in Georgia, Mr. Bridgers obtained a score of 79 on a Culture Fair Intelligence Test. E.H. Vol. 3: 30. It is not known when the test was administered nor by whom or under what circumstances.

The Culture-Fair is a non-verbal, "culturally reduced" test of "fluid intelligence." The test was created by Raymond Cattell, who theorized that the classical concept of intelligence

---

[13] Additionally, it has been found that the administration of a two-subtest short form WAIS-R results in an overestimation of full IQ. *See* A.P. Thompson, *et al.*, *Two- and Four-Subtest Short Forms of the WAIS-R: Validity in a Psychiatric Sample*, 18 CAN. J. BEHAV. SCI. 291 (1986) (stating that validation studies of the short form tests indicate that they overestimate full IQ); Gary Groth-Marnat, HANDBOOK OF PSYCHOLOGICAL ASSESSMENT 200 (3d ed. 1999) (noting that short form IQ tests frequently overestimate IQ scores by about 10 points). Moreover, the administration of the WAIS-R by Dr. Gilhousen within just one and one-half months from the last time Mr. Bridgers was administered it in March means the score also likely reflects a "practice effect," which is an inflation in the score that should be taken into account when considering limitations in intellectual functioning:

> Recognize the impact of practice effect. Practice effect refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same test. Practice effect gains occur even when the examinee has not been given any feedback on his performance regarding test items; nor do they reflect growth or other improvement on the skills being assessed. For example, the WAIS-III manual (1997) presents data illustrating the potential artificial increase in IQ scores when the same instrument is readministered within short time intervals. The WAIS-III manual reports an average increase of 5 points on the Full-Scale IQ between administrations with intervals of 2 to 12 weeks. Thus clinicians need to be sensitive to these practice effects and best practices in intellectual assessment recommendations against administering the same intelligence to someone within the same year.

AAIDD USER'S GUIDE at 21 (citations omitted).

could be divided, or "split," into two forms: crystallized intelligence, which represents the accumulated knowledge of an individual, and fluid intelligence, which is "defined very prominently by tasks in which analytic ability … is emphasized." *See* R. Cattell, *A Check on the Theory of Fluid and Crystallized Intelligence with Description of New Subtest Designs*, 11 J. EDUC. MEASUREMENT, 139, 140 (1978); William R. Koch, *Culture Fair Intelligence Test, in* TEST CRITIQUES, Vol. 1, at 233 (1984). It is not a comprehensive test of intelligence, but tests only the subset of intelligence Cattell identified as relevant to fluid intelligence ("Gf").[14]

Flynn has found that IQ gains over time are *largest* for tests of fluid intelligence with "culture-reduced content." *See* James R. Flynn, *IQ Gains over Time, in* ENCYCLOPEDIA OF HUMAN INTELLIGENCE 617 (Robert J. Stenberg ed., 1994).[15] The available data showed that there was not a single country "in which verbal gains match[ed] the gains on culture-reduced, or performance, or nonverbal tests and often the ratios run against verbal gains by two or three to one." *Id*. at 618. Although there is no available data for the rate of IQ gains over time specifically for the Culture-Fair, gains on tests *like* the Culture-Fair (culture-reduced, nonverbal test) are known to be even greater than those for the Wechsler scales (verbal section included), or greater than 0.33 per year.

Cattell's Culture-Fair Intelligence Test was normed no later than 1961, when it was published. Although the precise year in which Mr. Bridgers was administered the exam is unknown, it is believed he was administered the test while incarcerated in Georgia, between 1993 and 1995. He was therefore given a nonverbal, culture-reduced test having norms *at least*

---

[14] By contrast, the Wechsler scales, including the WAIS-R, contain both a "verbal" and a "performance" section to measure intelligence.

[15] Flynn places the average gain from the best data on these kinds of tests at 15 points per generation. *Id*.

32 years old. Even at the lower rate of IQ gain applicable to the Wechsler scales, this translates to an eleven (32 * .33 = 10.56) point inflation. Thus, Mr. Bridgers' score of 79 on a Culture-Fair Intelligence Test administered no earlier than 1993 yields an adjusted score of *no more than* 68. This score is consistent with Mr. Bridgers' performance on both 1998 WAIS-R administrations.[16] *See also* Exhibit 17, at 15, Table 1 (Declaration of Daniel J. Reschly, Ph.D.) (culture fair IQ score has "minimal" probative value); *id*. at 16 ("The results from this test are not credible.").

### e. WISC-R (1981).

Records from Portsmouth Public Schools reflect that in 1981, at the age of nine, Mr. Bridgers was administered a Wechsler Intelligence Scale for Children, Revised ("WISC-R"). Exhibit 7 (Portsmouth Public School records). The record reflects a full-scale IQ score on this test as "86-92." A review of the reported subscale scores, however, reflects that an error was made in the tabulation and that the record *should have* reflected a full-scale IQ score of 80. *See* E.H. Vol. 3: 29; Exhibit 5 at 4 (Affidavit of Mark Cunningham, Ph.D., ABPP, July 17, 2006). Adjusted for the Flynn effect and a standard error of measurement of plus or minus five points, the 1981 WISC-R test reflects an IQ score for Mr. Bridgers of between 72 and 82.[17] E.H. Vol. 3:

---

[16] Additionally, because mentally retarded persons—particularly those with mild retardation—are generally more impaired in their language than in their non-language domains, non-verbal intelligence tests such as the Culture-Fair are considered an inappropriate instrument for the assessment of intelligence in a mental retardation inquiry which can result in inflation of their true IQ scores independent of the Flynn effect. *See* George S. Baroff, MENTAL RETARDATION: NATURE, CAUSE, AND MANAGEMENT 31 (3d ed.) Philadelphia Brunner/Mazel, (1999); George S. Baroff, *Establishing Mental Retardation in Capital Cases: A Potential Matter of Life and Death*, Mental Retardation, Vol. 29, No. 6, 1991, at 346-47.

[17] The WISC-R was normed in 1972, so nine years elapsed between the time it was normed and Mr. Bridgers was administered the exam. This results in a three-point increase in the mean (9 x .33 = 2.97). Exhibit 5 at 4. Keeping the mean at 100, however, yields a reduction

71; Exhibit 5 at 4.  Thus, while the lower end of this range is within the approximate cut-off for a diagnosis of mental retardation, the test nonetheless appears to be an outlier, in that it is slightly higher than his other scores.

There are two reasons why this Court should not rely upon Mr. Bridgers's 1981 WISC-R score in the assessment of his intellectual functioning.  First, the fundamental calculation error observed on the 1980 WISC-R raises serious questions about the competence of the persons doing the testing, and the associated reliability of other testing procedures and scoring involved in its administration.  Indeed, the person who administered the WISC-R to Mr. Bridgers, Reba Dismukes, was not a licensed psychologist at the time, giving added credence to this possibility.  Because of that, her work required review and approval by a licensed supervisor.  However, that supervisor, too, missed the basic calculation error.[18]

Second, when Mr. Bridgers was 11 or 12 years old, he was the victim of an auto-pedestrian accident in which he was struck by a car while attempting to cross the street.  According to his brother, who witnessed the accident, Mr. Bridgers, after being struck, was thrown in the air "higher than the red light" and landed about 60 feet from where he was struck.  E.H. Vol. 2: 157.  Passers-by who had witnessed the accident and stopped to help put a blanket over Mr. Bridgers because they believed him to be dead.  *Id*. at 157-58.  As a result of the accident, Mr. Bridgers was hospitalized.  His step-father described his head as being so swollen

---

in Mr. Bridgers' score by three points, to a 77.  When the standard error of measure of plus or minus five points is taken into account, the resulting range is between 72 and 82.  *Id*.

[18] As will be discussed, *infra*, this simple calculation error, causing the evaluators to believe Mr. Bridgers possessed normal intelligence rather than borderline intelligence, likely resulted in a misdiagnosis of Mr. Bridgers as learning disabled, a diagnosis that stuck with him for the remainder of his educational development, as he was apparently never assessed by the school system again.

from the accident that "it made him like he had two heads on the right side." *Id*. at 11; *see also* E.H. Vol. 1: 24. Family members noticed a perceptible decline in Mr. Bridgers' cognitive abilities following the accident. E.H. Vol. 2: 162. Exhibit 5 at 4-5 (Affidavit of Mark Cunningham, Ph.D., ABPP, July 17, 2006). Because of Mr. Bridgers' significant head trauma, even if his WISC-R score were a reliable measure of his intellectual functioning at that time, it would not be a reliable measure of his intellectual functioning after the accident causing significant head trauma.[19] *See* Exhibit 17, at 15, Table 1 (Declaration of Daniel J. Reschly, Ph.D.) (WISC-R IQ score has "minimal" probative value); *id*. at 14 ("…the value of these test results are highly suspect").

### 2. Evidence of Significant Limitations in Adaptive Behavior.

Mr. Bridgers also meets the second prong of the definition of mental retardation: he possesses significant limitations in adaptive behavior. Mr. Bridgers possesses significant limitations in his conceptual, social, and practical skills.

### a. Conceptual Skills.

Relevant to Mr. Bridgers' language, reading and writing, and money concepts skills, Norfolk Public School records reflect that Mr. Bridgers was placed in the second grade three times. Exhibit 8 at 2981 (Norfolk Public School records). In April of 1979, at the age of 8 years old and in second grade, Mr. Bridgers was given an "SRA Assessment Survey," on which he scored at the first grade level in reading and language arts. *Id*. at 2875. One year later, Mr. Bridgers was still in second grade. He was administered another "SRA Assessment Survey," on which he again scored at the first grade level in reading and language arts. *Id*. During Mr. Bridgers' first attempt at second grade, his teacher gave him "unsatisfactory" marks for "follows

---

[19] The hospital to which Mr. Bridgers was taken, DePaul Medical Center, has apparently destroyed the medical records relating to its treatment of Mr. Bridgers.

directions" and "listens attentively." *Id*. at 2893. On July 30, 1980, at age 9, Mr. Bridgers was assessed by a diagnostic specialist. Noting that Mr. Bridgers was "functioning in reading at a pre-primer level" and had "made hardly any progress in the area of reading," and finding demonstrated weaknesses in identifying tens and ones, skip counting, fractional parts of a whole, and "value of coins," the specialist recommended Mr. Bridgers to Special Services. *Id*. at 2979-80. As Mr. Bridgers was entering second grade for the third time, the school ordered a sociocultural appraisal for Mr. Bridgers in which the evaluator noted that despite a home environment conducive to learning, including "ample reading materials," Mr. Bridgers could not read. The report related that Mr. Bridgers "would love to learn to read, but gets upset when he can't." *Id*., at 2972-78. Mr. Bridgers was then evaluated by a multidisciplinary team that in March of 1981 found him suitable for special education classes. *Id*. at 2981-84. The team administered reading and math tests to Mr. Bridgers on which he scored at the beginning of the second grade in reading and in the middle of the second grade in math, this despite his having already been through the second grade two times. *Id*. While Mr. Bridgers continually repeated second grade, his younger brother, Harry Bridgers, Jr., passed him up in school. S.F. Vol. 34: 31. In April of 1981, Mr. Bridgers again took the SRA Assessment Survey and again scored in the first grade in reading and language arts. *Id*. at 2876.

In October of 1981, just a month after Mr. Bridgers' mother signed permission for him to be placed in special education at Portsmouth, his family moved, and Mr. Bridgers transferred to a school in Virginia Beach. Virginia Beach immediately placed him in special education. *Id.* at 2986. Mr. Bridgers was then given a Brigance Inventory of Basic Skills to determine his present level of performance. His reported reading scores were:

| | |
|---|---|
| Word Recognition | 1.9 |
| Oral Reading | 1.0 |

*Id*. at 2970.  At the end of the school year in May 1982, Mr. Bridgers' eligibility for special education was renewed, because he was "functioning below academic expectations in reading and math."  *Id*. at 2957.

During the 1982-1983 school year, Mr. Bridgers' report card reflects that his special education teacher marked him as "needs improvement" in Language Arts Development in 10 of 15 categories.  *Id*. at 2883.  In April of 1984, Mr. Bridgers was administered a "BLS Reading Level IV" exam on which he answered only 62% correct.  Mr. Bridgers obtained below 50% in the areas of "hear selection," "implied main idea," "multi-syllable words," "alphabetization," "summarize main idea," "root and prefix," "know suffixes," "root and suffix," and "cause/effect."  *Id*. at 2873.  In fifth grade in 1983, standardized testing scores reflect Mr. Bridgers functioning at a second and third grade level in reading and spelling.  *Id*. at 2937.

Mr. Bridgers was given a "BLS Reading Level VI" exam in 1986 in which he obtained a total of 44 of 104, or 42%.  The areas in which he obtained below 50% on this exam were "appropriate reference," " context word meaning," "guide words," "sentence topic," "missing words," "skim selection," "detail outline," "cause/effect," "use card catalog," "summarize main idea," and "implied main idea."  *Id*. at 2869-70.  Mr. Bridgers continued to earn below average grades in reading and English special education classes in 7th and 8th grades, often failing both. *Id*. at 2864.  In the seventh grade, standardized testing scores reflect Mr. Bridgers was performing in math, reading, and spelling at a third grade level.  *Id*. at 2949-50.

Mr. Bridgers entered non-special education classes when he enrolled at Bayside High School in Virginia Beach in 1987, although he was still placed in a learning disabled reading class.  His first semester there, Mr. Bridgers failed all his classes with the exception of his

reading development class, in which he earned a D. Exhibit 9 at 2635 (Virginia Beach Public Schools records). Mr. Bridgers withdrew from the high school during the next semester. *Id.*, at 2637.

Throughout the time he was in school and "on his best days," Mr. Bridgers could "probably get in a sentence or two" of reading. E.H. Vol. 1: 53. On occasions where his mother would read something to Mr. Bridgers and ask him to explain what was read to him, Mr. Bridgers was unable to do so. *Id.* Mr. Bridgers' step-father, Gary Gorum, had to spend more time giving reading instruction to Mr. Bridgers than to his younger brother, Harry Jr. E.H. Vol. 2: 14. Growing up, Mr. Gorum would try to read the Bible with Mr. Bridgers two, three, or more times a week. *Id.* at 15-16. Mr. Bridgers had problems explaining passages from the Bible that he had attempted to read or that were read to him by Mr. Gorum. According to Mr. Gorum, he could not understand what he was reading. *Id.* at 17. When asked how Mr. Bridgers' younger brother's ability to explain parts of the Bible was different from Mr. Bridgers', Mr. Gorum explained, "Well, Harry, as we always said, that he was a normal child. Not putting Mr. Bridgers down or anything like that, but he could not grasp the meaning like Harry could do. Harry could spell any word there is. He could read any word there is. Mr. Bridgers had a problem with that. He still does." *Id.* at 18. As part of his religious upbringing as a Jehovah's Witness, Mr. Bridgers was assigned passages from the Bible every three weeks to a month that he was to read publicly before the congregation. Mr. Gorum would begin practicing with Mr. Bridgers three weeks in advance of his reading during the course of which Mr. Bridgers "was always making mistakes," although trying to the best of his ability. *Id.* at 19. When he would actually give the assignment in the Kingdom Hall, he was unable to do it. *Id.* at 19-23. He

would read some of it, but he would skip some, including whole sentences. Words that Mr. Gorum felt he had been taught to pronounce in those weeks, he no longer could. *Id*.

Mr. Bridgers progressed in his functional academic skills only minimally up to the time of the commission of the underlying offense. Georgia prison records from when Mr. Bridgers was an adult reflect Wide Range Achievement Test ("WRAT") scores of 2.0 Reading, 2.0 Math, and 3.2 Spelling. Defendant's Exhibit 6 (Trial). Georgia State Board of Pardons and Paroles records reflect Mr. Bridgers' "Parole Review Summary" in which it was noted that Mr. Bridgers "completed Drug Education, but failed to upgrade his academic level." State's Exhibit 51 (Trial). As an adult, Mr. Bridgers was observed by a psychiatrist during one of his hospitalizations to have "concrete proverb interpretation, i.e. 'People in glass houses should not throw stones' interpreted as 'you will break the glass.'" Exhibit 10 at 32 (Eastern State Hospital records).

Relevant to self-direction, when Mr. Bridgers was 11 years old, his mother provided answers for a "Social Adaptive Behavior Checklist." There, she noted that Mr. Bridgers "rarely" asked for help when necessary and was "never" able to use available public transportation. Exhibit 8 at 2942, 2944 (Norfolk Public Schools records). School records reflect that in his first attempt at second grade, his teacher gave him an "unsatisfactory" mark for "works well independently" and "strives to complete work." *Id*. at 2893. He received an unsatisfactory mark for "works well independently" by his fifth grade teacher also as well as for "shows initiative." *Id*. at 2881.

Georgia prison records admitted during the punishment phase of Mr. Bridgers' capital trial reflect that a "Treatment Plan" record noted Mr. Bridgers' "pattern of quitting when things become difficult." Defendant's Exhibit 6 (Trial). A medication evaluation record from the

Georgia prison by Dr. Charlesetta Shelton described Mr. Bridgers as being "worried about his release and whether or not he will be able to function, worries about choices that he will have to make." *Id*. Mr. Bridgers' dependence on prison mental health staff (to the point where dependency as specific mental disorder was considered by the staff) is a constant theme running throughout the Georgia prison records.

Mr. Bridgers is also uniformly described by those who knew him during the developmental period as a "follower." E.H. Vol. 1: 40; E.H. Vol. 2: 45, 253; S.F. Vol. 34: 35. Mr. Bridgers would not typically initiate activities on his own but would act at the behest of others and would do what others asked of him, even if it got him trouble. He did not correct this behavior even when its undesirability was explained. *See, e.g.,* E.H. Vol. 1: 57 (other people could get Mr. Bridgers to do things they wanted him to do); E.H. Vol. 2: 45-46 (Mr. Bridgers had ideas but unable to carry out); 47-49 (Mr. Bridgers would listen to anybody). Testimony further indicated that Mr. Bridgers never lived alone or independently. E.H. Vol. 2: 182-83.

### b. Social Skills.

Relevant to Mr. Bridgers' interpersonal skills, Mr. Bridgers was quiet and stayed to himself growing up. E.H. Vol. 2: 163. He did not intermingle with people. E.H. Vol. 1: 26. Mr. Bridgers "always looked off like he was in outer space or brain dead." Exhibit 11 at 1, ¶ 4 (Declaration of William Bridgers, III). He "never laughed, never played and never talked like a normal kid; he was always off." *Id*.

> Allen was shy and reserved and never spoke unless spoken to. He wouldn't look you in the eye when he spoke. He wasn't aggressive and never stood up for himself.

*Id*. at 2, ¶ 5. When Mr. Bridgers was 15, he lived for a short period of time with his biological father, Harry Bridgers, Sr., in Georgia. According to Bridgers Sr.:

> Allen would wait for me at the bus stop when I got off from work. Most kids his age were off running around with friends, but Allen just tried to stay by my side. He never had any friends.

Exhibit 12 at 2, ¶ 9 (Declaration of Harry Bridgers, Sr.). Mr. Bridgers's mother, with whom Mr. Bridgers lived during most of his developmental period, described his personality growing up as "basically quiet, sad and a loner." E.H. Vol. 1: 25. He had only two friends. E.H. Vol. 1: 26-27, 200-01. He spent time around his younger brother's friends, but he could not relate to them. *Id.* at 27-28. Mr. Bridgers' younger brother testified at the punishment phase of the underlying trial that everybody Mr. Bridgers knew was through him and that Mr. Bridgers was like a "tag-along." S.F. Vol. 34: 61. Mr. Bridgers lacked the ability to engage in friendships with people. *Id.* at 119-20. Likewise, Mr. Bridgers did not have many relationships with the opposite sex. Mr. Bridgers' brother could only recount three girls with whom Mr. Bridgers had any kind of relationship with. E.H. Vol. 2: 163, 241-42. His peers at school made fun of Mr. Bridgers because of his attendance in special education classes and because he could not read. E.H. Vol. 2: 161-62. As an adult, Mr. Bridgers did marry, but the relationship was short. Mr. Bridgers married Tina Bridgers after having known her only a few months and records described the marriage as "sudden." Exhibit 10 at 26 (Eastern State Hospital records). Records related to Mr. Bridgers' hospitalizations during the period reflect significant deterioration in the relationship after only a few months and an inability to cope with the marriage and his wife's four children. Exhibit 13 at 4 (Sentara-Norfolk Hospital records); Exhibit 10 at 33.

School records reflect that Mr. Bridgers received an unsatisfactory grade by his fifth grade teacher for "shows courtesy and consideration" and "meets new situations well" under the "sociability" section of his report card. Exhibit 8 at 2881 (Norfolk Public School records). Records from the Georgia State Board of Pardons and Paroles reflect that Mr. Bridgers' "Parole

Review Summary" stated, "Bridgers has problems with institutional adjustment and poor relationships between staff and peers." State's Exhibit 51 (Trial). A psychologist at a mental health/mental retardation correctional facility noted that Mr. Bridgers was a "loner" and that he "tends to isolate." Defendant's Exhibit 6 (Trial). Mr. Bridgers reported to her that he was like this since early childhood, "where he spent most of his time in his room or with his brother." *Id*. Hospital records where Mr. Bridgers sought help for depression reflect that he had minimal interaction with peers in his groups and a "Progress Notes" record reflects that increased interaction was encouraged. Exhibit 13 at 34, 37, 38 (Sentara-Norfolk Hospital records). Mr. Bridgers was also described therein as "isolative." *Id*. at 32, 34. *See also id*. at 19. Mental health professionals at DePaul Medical Center recommended in 1996 that Mr. Bridgers receive services for "recreation/social opportunities." Exhibit 14 at 773 (DePaul Medical Center records). An admission form from Eastern State Hospital reflects some of Mr. Bridgers' short term needs to be "improve socialization," "reduce anxiety," and "improve leisure time." Exhibit 10 at 54. A note on the admission form describes Mr. Bridgers' "attitude/socialization" as "guarded" and states, "[patient] interacting selectively [with] peers on ward." *Id*.

Relevant to Mr. Bridgers' responsibility, Mr. Bridgers' step-father refrained from assigning certain tasks to Mr. Bridgers that he would assign to Mr. Bridgers' younger brother because he did not believe Mr. Bridgers would be able to handle them. E.H. Vol. 2: 44. Mr. Bridgers' mother restricted Mr. Bridgers' freedom of movement more than his younger brother because she felt his younger brother to be more responsible. E.H. Vol. 1: 202. Mr. Bridgers was irresponsible with money. If he had any, it would be gone the next day. He did not know how to save, and he would also use it to purchase things for other people. *Id.* at 44-45, 53-54. According to an uncle:

> Allen was never all there. The boy never had a clue what he was doing. He didn't understand the choices he was making. For example, Allen met [his ex-wife] Tina through a friend of Harry Jr.'s. She had four kids. How could he possibly know what he was doing when he married her days after meeting her? Allen didn't know what love was. He made terrible choices in life.

Exhibit 15 at 1-2, ¶ 7 (Declaration of Dwight Bridgers).

In Mr. Bridgers's first attempt at second grade, his teacher gave him an "unsatisfactory" mark for "exercises self-control." Exhibit 8, at 2893 (Norfolk Public Schools records). His fifth grade teacher gave him unsatisfactory marks for the same as well as for "assumes responsibility" and "exercises leadership." *Id*., at 2881. A Georgia prison record from MH/MR Department of Jack Rutledge CI noted one of Mr. Bridgers' "presenting problems" as "[a]ccept[ing] no responsibility for his action." Defendant's Exhibit 6 (Trial). Hospital records where Mr. Bridgers sought help for depression and crisis intervention following his release from prison in Georgia reflect that Mr. Bridgers was typically noncompliant with medications he was prescribed to take. *See* Exhibit 13, at 7, 15 (Sentara-Norfolk Hospital records); Exhibit 14, at 763 (DePaul Medical Center records). He was recommended for "medication management" services upon discharge from DePaul Medical Center. Exhibit 14, at 773. On two occasions, Mr. Bridgers checked himself out of hospitals against medical advice or before the recommended discharge date. Exhibit 13, at 5, 17. He was admitted into a hospital emergency room just two days following the second discharge when he attempted to commit suicide. Exhibit 14, at 763.

Relevant to Mr. Bridgers' self-esteem, Mr. Bridgers was ridiculed and ostracized by his peers due to his being in special education classes and his inability to read. E.H. Vol. 2: 161-62; S.F. Vol. 34: 35. His own biological father "never had anything good to say about him" and "called him stupid and a retard." Exhibit 12 at 2, ¶ 10 (Declaration of Harry Bridgers, Sr.). One of the girls Mr. Bridgers had a relationship with in middle school broke up with him after a

week, saying he was "retarded." E.H. Vol. 1: 153. Growing up, Mr. Bridgers was "sad all the time," and his low self-esteem led him to always try to copy his younger brother or others in dress and appearance. *Id.* at 47-48.

School records reflect that during his first attempt at second grade, his teacher gave him an "unsatisfactory" mark for "exhibits self-confidence." Exhibit 8 at 2893 (Norfolk Public Schools records). He received the same mark by his fifth grade teacher as well as for "takes pride in work." *Id.* at 2881. A psychological evaluation of Mr. Bridgers conducted by Diane Solursh, Ph.D. at the Augusta Correctional and Medical Institution (ACMI) described Mr. Bridgers as as having a "significantly reduced sense of self-worth and self esteem." Defendant's Exhibit 6 (Trial). "MH/MR Treatment Plans" from both ACMI and the Jack Rutledge CI noted one of Mr. Bridgers's "presenting problems" as "low self esteem." *Id.* He was referred to "self-esteem group" at Rutledge CI. *Id.* When Mr. Bridgers was evaluated by psychologist Maureen Forston, she observed that "Mr. Bridgers seems to have very low self esteem and is not skilled in many areas." *Id.* Mr. Bridgers's discharge summary from Sentara-Norfolk General Hospital of November 15, 1996, states that Mr. Bridgers checked himself in complaining, among other things, of "low self-esteem." Exhibit 13 at 4. An admission form from Eastern State Hospital, where Mr. Bridgers was placed after his third suicide attempt, reflects as one of Mr. Bridgers's short term needs "improve self-esteem." Exhibit 10 at 54.

Relevant to Mr. Bridgers' gullibility, he was unanimously described by those who knew him as a follower. E.H. Vol. 1: 40 (testimony of Linda Gorum); E.H. Vol. 2: 45 (testimony of Gary Gorum); 253 (testimony of Harry Bridgers, Jr.); S.F. Vol. 34: 35. His step-father described him as "very gullible," more gullible than his younger brother, who he characterized as "normal." E.H. Vol. 2: 46-47. Mr. Bridgers's younger brother also characterized Mr. Bridgers

as gullible, more so than others his age.  *Id.* at 168, 171.  According to Dwight Bridgers, Mr. Bridgers's paternal uncle, "Allen was so gullible that if he had any money you could sell him the London Bridge."  Exhibit 15 at 1, ¶ 6 (Declaration of Dwight Bridgers).

Mr. Bridgers was easily influenced by other people.  E.H. Vol. 1: 58; E.H. Vol. 2: 46; Exhibit 15 at 1, ¶ 6 (Declaration of Dwight Bridgers).  According to his step-father, "anybody that come in contact with him could entice him [or] influence him to do whatever they wanted to do."  E.H. Vol. 2: 46.  Mr. Bridgers could easily be talked into doing things by his cousins and peers.  E.H. Vol. 1: 58.  To try to gain friends, Mr. Bridgers sought to please people, which made him vulnerable to his being taken advantage.  E.H. Vol. 1: 41.  On one occasion when Mr. Bridgers was twelve, his parents had just bought him and his younger brother new bicycles. Neighborhood children talked Mr. Bridgers into giving them his new bike for their old bike.  *Id.* In another instance, Mr. Bridgers's peers talked him into giving them a stereo that his step-father had recently given him.  E.H. Vol. 1: 202-03; E.H. Vol. 2: 171.  Mr. Bridgers's brother noted, "If [you] wanted something from [him], it would be easy to get from him."  E.H. Vol. 2: 170. Against his mother's repeated instructions, Mr. Bridgers routinely gave things to other people. E.H. Vol. 1: 44-45.  Mr. Bridgers's uncle told a similar story:

> [Allen] once took and sold Grandma Marie's car to buy speakers for strangers. He had no idea what he was doing.  I could at least understand the reasoning of taking a *stranger's* car to buy speakers for a *family member* but not the other way around.  It showed me how clueless Allen was.  The boy is not bright and clearly mentally challenged.

Exhibit 15 at 1, ¶ 6 (emphasis in original).

Mr. Bridgers' parents treated him differently than his younger brother, including restricting his freedom of movement, out of concern that others would take advantage of him because he was so trusting of other people.  E.H. Vol. 1: 35, 56-57, 205; E.H. Vol. 2: 49.  Mr.

Bridgers's brother had to "look out" for Mr. Bridgers, despite his brother's being one year younger than Mr. Bridgers. E.H. Vol. 2: 160. Mr. Bridgers did not defend himself when people wanted to fight him, so his younger brother also had to take care of that for him. *Id.* at 165.

Relevant to Mr. Bridgers's naivete, all witnesses at the evidentiary hearing testified they would so characterize Mr. Bridgers. E.H. Vol. 1: 57; E.H. Vol. 2: 46; 168. Mr. Bridgers's brother described him as being immature for his age. E.H. Vol. 2: 161. His level of maturity made him seem different from others his age. *Id.* at 163.

Relevant to Mr. Bridgers's rule-following behavior, school records reflect that Mr. Bridgers received disciplinary action and was suspended several times. Exhibit 8 at 2929-36 (Norfolk Public Schools records). At age 12, Mr. Bridgers received a disciplinary notice for fighting when another student put glue on his desk. *Id.* at 2929. At age 13, Mr. Bridgers was suspended for two days when he did not report to school-wide detention. *Id.* at 2930. Mr. Bridgers received a "conduct notice" stating that to succeed in school, Mr. Bridgers had to improve his behavior in the following areas: participating in class activities, lacking "seriousness of purpose," being "rude and disrespectful towards teachers," insufficient preparation, and improve study habits. *Id.* at 2931. Still at age 13, Mr. Bridgers was suspended for 3 days for not reporting to the disciplinary office. *Id.* at 2932. Eleven days later, Mr. Bridgers was suspended for four days for sticking his hand out of the bus window and playing with a firecracker. *Id.* at 2933. Nine days later, Mr. Bridgers was suspended for two days for walking out of class without permission and being rude and disrespectful towards his teacher. *Id.* at 2934. At age 14, Mr. Bridgers was given a disciplinary notice for being in possession of property that was not his. *Id.* at 2935. Also at 14, Mr. Bridgers was suspended for five days for fighting on the bus, disrupting class, and threatening vandalism to a teacher's car. *Id.* at 2936.

Records from Georgia and testimony from the underlying trial reflect that Mr. Bridgers was on probation when he committed his second burglary in that state and when was caught for credit card fraud, a violation of the rules of his probation. State's Exhibit 50 (Trial).

While in prison in Georgia, Mr. Bridgers was disciplined several times and placed in isolation. On June 9, July 29, and October 5, 1993, Mr. Bridgers was written up for insubordination. State's Exhibit 51 (Trial). His overall institutional behavior was rated "below average" in December that year. *Id.* In June of 1995, Mr. Bridgers was written up for hanging sheets and blankets over his window to make it dark. *Id.* In October, Mr. Bridgers pleaded guilty to causing an act possibly causing injury when he attempted to slit his wrists. *Id.* In January of 1996, Mr. Bridgers pleaded guilty to failure to follow instructions. *Id.* Mr. Bridgers also violated the rules of his parole when he left Virginia with truck driver Donnie Miller, used drugs (according to testimony from the underlying offense), and was convicted of committing capital murder.

Relevant to Mr. Bridgers's ability to obey laws, Mr. Bridgers has repeatedly violated laws and been in trouble with the law. Mr. Bridgers committed burglaries as a juvenile for which he was sent to a juvenile detention center. E.H. Vol. 1: 58, 116, 121-22, 156-57; E.H. Vol. 2: 56-57. Records and testimony from the underlying trial reflect that Mr. Bridgers was arrested two times in California and at least three times in Georgia. State's Exhibit 47 (Trial); State's Exhibit 50 (Trial); State's Exhibit 51 (Trial). Mr. Bridgers was also convicted of committing the capital murder in Texas that forms the underlying offense of these proceedings. Mr. Bridgers also has a documented history of drug abuse in violation of the law. *See, e.g.,* Exhibit 13 at 4, 16 (Sentara-Norfolk Hospital records); Defendant's Exhibit 6 (Trial).

Relevant to Mr. Bridgers's ability to avoid victimization, Mr. Bridgers was picked on when he was a kid and usually did not defend himself. E.H. Vol. 2: 165. His mother recalled that Mr. Bridgers had once been beaten up by two other children at school, and Mr. Bridgers had not fought back because he did not understand the difference between starting a fight and defending himself from others. E.H. Vol. 1: 38-40, 210-11. Mr. Bridgers's younger brother felt like he had to protect Mr. Bridgers, who typically would not protect himself when others wanted to fight him. E.H. Vol. 2: 165.

### c.     Practical Skills.

Relevant to Mr. Bridgers's activities of daily living, testimony indicated that he was neat and hygienic. Although his mother testified that Mr. Bridgers learned to dress himself late, and that he initially was unable to match clothing appropriately, Mr. Bridgers eventually became a meticulous dresser. E.H. Vol. 1: 30.

Relevant to Mr. Bridgers's instrumental activities of daily living, testimony at the evidentiary hearing reflected that throughout his life Mr. Bridgers prepared only basic meals requiring one or two steps, typically prepared foods that were microwaveable. E.H. Vol. 1: 33, 175; E.H. Vol. 2: 43-44, 83-84, 164, 176, 181-82. Mr. Bridgers's mother believed if she had tried to teach Mr. Bridgers to cook, he would have set something on fire. E.H. Vol. 1: 35-36. Mr. Bridgers's biological father and uncle independently recalled Mr. Bridgers's difficulty with cooking. "If Allen cooked something, he would forget about it on the stove until it started fire. He tried to boil hot dogs but forgot about them twice." Exhibit 12 at 1, ¶ 8 (Declaration of Harry Bridgers, Sr.). His uncle recalled, "Allen was terrible at making food. He would put something on the stove and then forget about it and almost burn the house down." Exhibit 15 at 2, ¶ 9 (Declaration of Dwight Bridgers).

Mr. Bridgers was irresponsible with money.  E.H. Vol. 1: 53-54.  If he was given money, Mr. Bridgers would immediately spend it all until it was gone.  *Id.  See also* Exhibit 15 at 2, ¶ 9 (Declaration of Dwight Bridgers).  When Mr. Bridgers was 18 or 19, his mother opened up a checking account for him.  She had to close the account because the account was not being used properly and was overdrawn.  The returned checks that she received were written in handwriting other than Mr. Bridgers's and were for women's clothing.  E.H. Vol. 1: 54-55, 219.  Mr. Bridgers never saved his money and in the opinion of his step-father would not have been able to follow his advice that he should be doing so.  E.H. Vol. 1: 54; E.H. Vol. 2: 38.  Mr. Bridgers did not ever own a credit card.  E.H. Vol. 2: 42.

When he was younger, Mr. Bridgers was not assigned tasks like picking up items from the grocery store because he was unable to do it right.  When he was 11, Mr. Bridgers was sent to the store by his step-father to pick something up.  He returned with the wrong item and without any change.  Mr. Bridgers had to make three trips to the store to accomplish the task.  E.H. Vol. 1: 34-35.  Mr. Bridgers's biological father independently recalls similarly:

> Sometimes I would tell Allen to go across the street to the store with a list of things to get.  He would come back with only some of the items.  Allen would be upset and want to go back for the rest, but I told him to just forget about it.

Exhibit 12 at 2, ¶ 8 (Declaration of Harry Bridgers, Sr.).

In high school and as an adult, Mr. Bridgers relied on others to complete forms for him, such as job applications, loan forms, and doctor's office forms.  E.H. Vol. 1: 50-51, 195; E.H. Vol. 2: 41, 130-31.  Mr. Bridgers's mother had to fill out any forms that came through the mail for Mr. Bridgers.  E.H. Vol. 2: 131.  Mr. Bridgers never lived by himself but always resided with somebody else, even as an adult.  From the time he was born until his incarceration for the underlying offense, excepting the time spent in prison in Georgia, Mr. Bridgers lived with his

parents, his uncle, his girlfriend's family, his biological father, his paternal grandmother, his brother, his wife, and Donnie Miller. E.H. Vol. 2: 182-83, 244-47; S.F. Vol. 26: 44.

School records reflect that Mr. Bridgers received an unsatisfactory mark in fifth grade for "uses time wisely." Exhibit 8 at 2891 (Norfolk Public Schools records). Georgia prison records reflect an "MH/MR Treatment Plan" record that states one goal for Allen's treatment as "decreas[ing] dependency upon supportive networks, including staff and family." Defendant's Exhibit 6 (Trial). A Georgia prison psychologist wrote in her "Initial Psychological" with regard to Mr. Bridgers that "[he] is concerned that he will not be able to take care of himself and that he needs to go to a group home or a half way house while he can have more structure initially." The record reflects that the psychologist discussed with Mr. Bridgers the possibility of a half way house with a rigid program, and that Mr. Bridgers "seemed to accept this because he is afraid that he will not be able to manage himself initially." *Id*. A "Progress Record" notes that, after showing improvement in depressive symptoms while at the MH/MR facility, Mr. Bridgers still "continue[d] to feel he needs supportive living at present time." *Id*. The plan was "to encourage further weaning from supportive living and to develop peer support network outside of mental health through school/work activities." *Id*. At this time, the progress records indicate the staff was suggesting to Mr. Bridgers that he return to general population. *See id*. On November 2, 1994, the records reflect that Mr. Bridgers agreed to move to general population on a trial basis. *Id*. He was moved there on December 28, 1994. *Id*. On January 5, Mr. Bridgers requested to stop going to school. *Id*. In February, Mr. Bridgers began having problems going to his work in the laundry. *Id*. In late February, the records reflect that Mr. Bridgers reported onset of depression due to family relationship and on March 5, 1994, a little over two months after having been placed in general population, the counselor saw Mr. Bridgers who was complaining of

"stress and depression." *Id*. The counselor wrote in Mr. Bridgers's progress report, "In my opinion, this inmate is not functioning well in the general population unit," and reassigned Mr. Bridgers to a level for mental health inmates pending reevaluation. *Id*. Hospital records where Mr. Bridgers sought treatment for depression after his release from prison reflect that he was not compliant with his prescribed medication. Exhibit 13 at 7, 15 (Sentara-Norfolk Hospital records).

Relevant to Mr. Bridgers's occupational skills, Mr. Bridgers's step-father, Gary Gorum, employed Mr. Bridgers in his flooring business and testified at length as to his experience. Mr. Gorum began bringing Mr. Bridgers and Mr. Bridgers's younger brother to work with him when Mr. Bridgers was approximately nine or ten years old, but did not begin to regularly employ them until they were approximately 14. E.H. Vol. 2: 27. Mr. Bridgers began by doing "clean out," which consists of picking up the trash and handing tile to those laying it. *Id*. at 29. Anybody who wanted to work for Mr. Gorum's business would begin at this level of employment. If a person advanced, he would begin spreading glue. *Id*. The next level of employment was mechanic, who actually cuts and lays tile. *Id*. Mr. Gorum testified Mr. Bridgers had difficulty with his job responsibilities, including cleaning. Mr. Bridgers would leave foreign particles and paint drippings on the floor and would not clean out corners well. *Id*. at 31. Mr. Gorum explained to Mr. Bridgers why there could not be any foreign particles on the floor, but he would nonetheless have to repeat the same instructions to him over and over again. *Id*. at 32. When Mr. Bridgers was about age 17, before he left to live with his uncle in California, Mr. Gorum allowed Mr. Bridgers to try to spread glue, but Mr. Bridgers's work was "shabby." *Id*. at 33. He would have problems getting glue close enough to the walls but not on the walls, and he repeated this mistake despite repeated instructions from Mr. Gorum about how

to properly spread the glue.  *Id*.  According to Mr. Gorum, Mr. Bridgers never went past this stage.  *Id*.  Other employees, including Mr. Bridgers's younger brother, advanced to stages ahead of Mr. Bridgers.  *Id*. at 35.

Mr. Bridgers went back to work for Mr. Gorum after his release from prison in Georgia at about age 25.  E.H. Vol. 2: 35.  Mr. Bridgers began with the responsibilities of cleaning out again.  *Id*. at 35.  Eventually, Mr. Gorum allowed Mr. Bridgers to try to lay linoleum.  *Id*.  When asked why he advanced Mr. Bridgers to laying linoleum despite his history of poor job performance, Mr. Gorum testified that he was much older than before and felt he was grown, but Mr. Bridgers was still unable to meet his job expectations.  *Id*. at 36-37.  Mr. Gorum's method of teaching was to let the person attempt do it himself, because he was always there to correct it.  *Id.* at 144-45.  During cross-examination, the district attorney explored Mr. Bridgers's occupational skills with Mr. Gorum further.  When asked whether as an adult Mr. Bridgers could clean the floor, spread the glue, and lay the linoleum correctly for at least some of the time, Mr. Gorum explained, "He could probably perform in that particular situation some of it, but there's always going to be some problems that the superintendent would actually find.  And I was him at that particular time.  I had to keep showing him constantly on other little things that he missed, even during that particular time."  *Id*. at 77-78.  Mr. Bridgers could never complete the tasks assigned to him correctly.  *Id*. at 78, 143.  As examples of errors Mr. Bridgers routinely made, Mr. Gorum testified he would leave the grout line too wide in the seam area and would miss the doorjambs.  *Id*. at 79.  Somebody would always have to come behind Mr. Bridgers and correct his mistakes.  *Id*. at 143.  Mr. Gorum felt that due to this, Mr. Bridgers was simply unable to learn how to do the task he was asking him to learn.  *Id*. at 146.  When asked whether, if another employee who was not his son had performed the way Mr. Bridgers had, he would have kept him

on, Mr. Gorum replied, "No." *Id*. at 36. He only allowed Mr. Bridgers to work for him because he was his son. *Id*. According to Mr. Gorum, who observed Mr. Bridgers at work for several years, "He would never be a mechanic." *Id*. at 146.

Mr. Bridgers's brother, who worked with Mr. Bridgers in their step-father's flooring business, testified that Mr. Bridgers was a hard worker, but he "couldn't take the necessary steps to become a … floor mechanic." E.H. Vol. 2: 174. When one began in the business, one would be a laborer who would clean up trash and unload the truck, "a gopher." *Id*. Mr. Bridgers's brother testified, "That's kind of where he stayed. You tried to show him how to spray the glue, lay the tile, cut the tile into the wall, he just didn't get it." *Id*. Mr. Bridgers made a lot of mistakes; his brother would provide instruction for Mr. Bridgers on how to do it the right way, but Mr. Bridgers repeated his mistakes. *Id*. at 175. Mr. Bridgers's brother described "filling out a job application" as one of the kinds of things in his everyday life that he could do that Mr. Bridgers could not. Mr. Bridgers's mother testified that she in fact filled out applications for Mr. Bridgers when he was in high school for jobs at fast food restaurants. E.H. Vol. 1: 50-51. The jobs lasted "a week or two" before Mr. Bridgers was let go. *Id*. at 51, 181.

Mr. Bridgers's social security records reflect extremely sporadic work of short duration, confirming the testimony of family members. Applicant earned $136 from Taco Bell in 1987 (age 16), $265 from Addington Beaman Lumber Co. in 1988 (age 17), $235 from Farm Fresh Inc. in 1988 (age 17), $153 from Virtexco Corp. in 1988 (age 17), $1,378 from Ellis Flooring, his step-father's flooring business, in 1988 (age 17), $161 from Burger King in 1988 (age 17), $98 from GMK Corporation in 1989 (age 18), $32 from Sarach Systems Inc. in 1989 (age 18), $24 from Alia Corporation in 1989 (age 18), $53 from Robert Wiggins in 1990 (age 19), $175 from Lardow Inc in 1990 (age 19), $36 from Robert Wiggins in 1992 (age 21), $350 from GFA

Contractors Inc in 1992 (age 21), and $2,002 from Ellis Flooring Contractor Inc., his step-father's business, in 1996 (age 25). Exhibit 16 (Social Security Administration records).

Georgia Department of Corrections records reflect an "MH/MR Treatment Plan" record that noted "appropriate work detail" for Mr. Bridgers to be "possibly laundry." Defendant's Exhibit 6 (Trial). A psychologist at the prison noted that Mr. Bridgers reported to her that "because of his dyslexia he had difficulties with working with people and that he was not able to manage the job" he had at Hardees in Georgia. *Id*. She also observed that he "is not skilled in many areas." *Id*. Records from the Georgia State Board of Pardons and Paroles reflect in a 1993 "Parole Review Summary" that Mr. Bridgers "currently works in Food Services where his last work performance was below average." State's Exhibit 51 (Trial). DePaul Medical Center records reflect that Mr. Bridgers was considered in need of "vocational/educational training" and "employment services" upon discharge. Exhibit 14 at 773.

Relevant to Mr. Bridgers's ability to maintain safe environments, records reflect that Mr. Bridgers has reportedly made three attempts to commit suicide, once by attempting to overdose on Zantac. Mr. Bridgers "thought the medication would in fact kill him and regretted it deeply when he eventually woke up approximately 24 hours later." Defendant's Exhibit 6 (Trial). While in prison in Georgia, Mr. Bridgers attempted to cut his wrists, albeit leaving only superficial wounds. *Id*. After his release from prison in Georgia, Mr. Bridgers again cut his wrists, requiring emergency room treatment on December 1, 1996. Exhibit 14 at 763.

Prior to his third suicide attempt, Mr. Bridgers had been checked into Sentara-Norfolk General Hospital on November 13, 1996, "with complaints of voices telling him to hurt himself, also with depressed mood, sleep disturbance, poor appetite and history of weight loss of 25 pounds." Exhibit 13 at 4. Mr. Bridgers was placed on Zoloft and Risperdal. *Id*. Two days later,

on November 15, Mr. Bridgers checked himself out prior to the recommended date of discharge. *Id*. at 5.  Mr. Bridgers was diagnosed with chronic post-traumatic stress disorder.

A week later, on November 23, 1996, Mr. Bridgers was brought back to Sentara-Norfolk by the police when his wife called 911 after discovering Mr. Bridgers with a knife on the bathroom floor threatening to kill himself.  *Id*. at 15.  Mr. Bridgers had ceased taking his prescribed medication and had begun using cocaine.  *Id.*  Mr. Bridgers "reported discord with his wife of five months saying that they were going to separate and that his wife wanted him to leave and was kicking him out of her house because he did not want to go to work.  The patient also claims to have had difficulty adjusting to his wife's four children. This happened about one day prior to admission."  *Id*.  Mr. Bridgers additionally complained of sleeplessness for three days due to hearing voices, of decreased appetite, of a sense of worthlessness, and of depressed mood. *Id*.  Mr. Bridgers was diagnosed with chronic post-traumatic stress disorder, and cocaine induced mood disorder, depressed, onset on withdrawal (Axis I); Peptic ulcer disease (Axis III); and discord with wife and physical abuse by stepfather (Axis IV).  *Id*. at 16.  Mr. Bridgers was restarted on medication.  *Id.* at 17.  A week after his admission, on November 30, 1996, Mr. Bridgers discharged himself from the hospital against medical advice.  *Id*.

Two days later, on December 1, 1996, Mr. Bridgers was admitted into the DePaul Medical Center emergency room due to lacerations to his wrists from a suicide attempt.  Mr. Bridgers was again noncompliant with his prescribed medication.  Exhibit 14 at 763.  He was diagnosed with multiple wrist lacerations, suicide attempt, depression, schizophrenia (acute exacerbation), and polysubstance abuse.  *Id*.  Clinical observations of Mr. Bridgers's behavior and symptoms at this time were, among others: poor self care, impaired impulse control, impaired judgment, withdrawn, depressed, anxiety, and suicidal ideation.  *Id*. at 767.  Mr.

Bridgers was transferred to Eastern State Hospital, where he was discharged as "not recovered" on December 17, 1996. Exhibit 10 at 28. There, he was diagnosed with recurrent severe major depressive disorder with psychotic features, cocaine abuse, alcohol abuse, and partner-relational problem (Axis I); personality disorder (not otherwise specified) with antisocial traits (Axis II); peptic ulcer disease (by history) and multiple lacerations to left wrist (Axis III); and problems with primary support group and separation from spouse (Axis IV). *Id.* Three days later, Mr. Bridgers's mother brought Mr. Bridgers back to the emergency room at DePaul Medical Center for crisis intervention. Exhibit 14 at 758. On this occasion, Mr. Bridgers was diagnosed with depression and schizophrenia. *Id.*

### 3. Expert Opinion.

Mr. Bridgers retained Daniel J. Reschly, Ph.D., to review records and testimony, meet with Mr. Bridgers, and opine on whether Mr. Bridgers is a person with mental retardation. Dr. Reschly has written specifically and extensively about, and is an expert in, mild mental retardation. As he explains in his report,

> Mild Mental Retardation is different qualitatively and quantitatively from both normal development and more severe levels of mental retardation. MMR is a subset of MR; any individual with MMR meets the diagnostic criteria for MR as well. Though they meet the diagnostic criteria, individuals with MMR are often misdiagnosed, and are often overlooked due to misinformed societal perceptions of what it means to be mentally retarded.

Exhibit 17, at 11 (Declaration of Daniel J. Reschly, Ph.D., May 20, 2009).

Dr. Reschly has a Ph.D. in school psychology from the University of Oregon and an M.A. in school psychology from the University of Iowa. Dr. Reschly is currently a Professor of Education and Psychology in Peabody College, Vanderbilt University, where he chaired the Department of Special Education from 1998-2006. During this period, the Department earned the number one national ranking. In 1999, Dr. Reschly was listed in the top five in school

psychology career service contributions and, in 2004, he was identified as the most widely cited author in school psychology books and journals during the 2002-2004 period. He has been active in state and national leadership roles including President of the National Association of School Psychologists (NASP), Editor of the School Psychology Review, Chair of NASP-NCATE Graduate Program Approval, President of the Society for the Study of School Psychology, and Chair of the Council of Directors of School Psychology Programs. Dr. Reschly served on the National Academy of Sciences Panels on *Standards-based Reform and the Education of Students with Disabilities* and *Minority Overrepresentation in Special Education*. He chaired the National Academy Panel on *Disability Determination in Mental Retardation*. He has received the NASP Lifetime Achievement Award, three NASP Distinguished Service Awards, the Stroud Award, appointment to Fellow of the American Psychological Association and the American Psychological Society, Charter Member of the Iowa Academy of Education, 1996 Outstanding Alumnus, College of Education, University of Oregon, 2000 NASP Lifetime Achievement Award, and the 2007 NASP Legend Award.

Dr. Reschly's opinion, based upon the above-described evidence, is that Mr. Bridgers is a person with mild mental retardation. *See* Exhibit 17, at 1. Dr. Reschly concluded that Mr. Bridgers possesses significant limitations in intellectual functioning:

> The balance of the evidence, particularly that which is sound, clearly indicates that Mr. Bridgers is a person who meets the intellectual functioning dimension of mental retardation. In addition, other evidence from educational assessment and adaptive behavior observations is consistent with the diagnosis of mental retardation. Mr. Bridgers' intellectual functioning is near the IQ of 70, meeting the AAMR and DSM-IV TR criteria for significant limitations in intellectual functioning.

*Id.* at 16. Dr. Reschly also concluded that Mr. Bridgers's possesses significant limitations in adaptive behavior in all three AAMR domains: conceptual, social, and practical:

Mr. Bridgers' significant limitations in adaptive behavior have appeared throughout his life, from early childhood through the adult years. The adaptive behavior limitations are apparent in all three domains, (a) conceptual, (b) social, and (c) practical. These limitations are documented by a wide variety of measures and observations, across varying settings, by many persons familiar with his behavior in the home, school, neighborhood, and community.

*Id*. at 16-17. He further concluded that

**D.    The Presence of Risk Factors and Other Indicia of Reliability Confirm That Mr. Bridgers Is a Person with Mental Retardation.**

The 2002 AAMR Manual describes four categories of risk factors that may interact to cause mental retardation. The four categories of risk factors are: (1) biomedical: factors that relate to biologic processes, such as genetic disorders or nutrition; (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness; (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and (4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills. 2002 AAMR Manual at 126 (excerpt attached as Exhibit 18). The 2002 AAMR Manual conceptualizes etiology of mental retardation as

a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the lie of the individual and across generations from parent to child. This construct replaced prior historical approaches that had divided the etiology of mental retardation into two broad types: mental retardation of biological origin and mental retardation due to psychosocial disadvantage (Grossman, 1983). McLaren and Bryson (1987) had noted in their review of epidemiological studies of mental retardation that as much as 50% of the population of individuals with mental retardation have more than one causal risk factor. Furthermore, mental retardation often reflects the cumulative or interactive effects of more than one risk factor.

2002 AAMR Manual, at 125. As reflected by the testimony during the evidentiary hearing in the state court, declarations from family members, and the documentary record, Mr. Bridgers has

been exposed to several risk factors that serve to confirm that Mr. Bridgers is a person with

mental retardation.

### 1. Biomedical Risk Factors.

The 2002 AAMR Manual states:

> A detailed family history is necessary to identify potential genetic etiologies [of mental retardation] (Curry et al., 1997). A detailed three-generation pedigree is recommended that includes information about the health status, medical and psychological disorders, and level of functioning of all known relatives. In particular, relatives who were affected by conditions that may be associated with mental retardation (e.g., autism) or who were diagnosed with mental retardation should be noted. Additional records concerning these individuals may be requested to provide further details.

2002 AAMR Manual, at 130. ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

[REDACTED]

Traumatic brain injury is also a postnatal biomedical risk factor. As discussed, *supra*, Mr. Bridgers was the victim of an auto-pedestrian accident as a child that caused Mr. Bridgers to suffer a significant head injury requiring hospitalization and a blood transfusion. *See* Exhibit 12, at 1, ¶ 5 (Declaration of Harry Bridgers, Sr.). Family members noticed a perceptible decline in Mr. Bridgers's cognitive abilities following the accident. E.H. Vol. 2: 162. Exhibit 5 at 4-5.

### 2. Social Risk Factors.

Prenatal poverty, postnatal family poverty prenatal domestic violence, lack of access to prenatal care, and impaired child-caregiver are social risk factors for mental retardation. *See* Exhibit 18. As reflected by the declarations and testimony of family members, Mr. Bridgers was born into and grew up in an unstable, poverty-stricken, highly dysfunctional and physically abusive environment.

Mr. Bridgers is the first son of Linda Gorum and Harry Bridgers, Sr. Mr. Bridgers's mother was only 16 years old when Mr. Bridgers was born. E.H. Vol. 1: 9. She did not know she was pregnant until eight months into the pregnancy. *Id*. at 10. Ms. Gorum explained that although she was aware she was not menstruating during this period, she did not think it unusual because she was "sickly" during this time from glandular problems. *Id*. As a result, Ms. Gorum received no prenatal health care at all prior to giving birth to Mr. Bridgers and, during her pregnancy, was taking prescribed medication for her gland infection. *Id*. at 11-12. Ms. Gorum smoked throughout the pregnancy. *Id*.

Harry Bridgers, Sr., Mr. Bridgers's biological father, drank alcohol excessively and abused narcotics, including cocaine and heroin before and after Mr. Bridgers was born. S.F. Vol. 34: 24, 28; Exhibit 12, at 1, ¶ 2 (Declaration of Harry Bridgers, Sr.) (describing how he had been abusing heroin and other drugs "regularly" when Mr. Bridgers was conceived and after he was born); *id*., at 1, ¶ 3 (describing his arrest while attempting to purchase drugs when Allen a baby); Exhibit 15, at 1, ¶ 2 (Declaration of Dwight Bridgers) ("During the period [Harry Sr. and Linda] were together, Harry Sr. was doing heroin, and it was controlling his life."); Exhibit 11, at 1, ¶ 1 (Declaration of William Bridgers, III) ("Besides using drugs, Harry Sr. was also a heavy drinker."); Exhibit 20, at 1, ¶ 4 (Declaration of Marie Bridgers) ("My brother Harry Sr. drinks all day long and used to be a heavy drug user. He is currently addicted to alcohol and uses crack."). Harry Sr.'s father—Mr. Bridgers's paternal grandfather—was an alcoholic who made and sold corn liquor in Virginia Beach. Exhibit 12, at 1, ¶ 1 (Declaration of Harry Bridgers, Sr.). Alcoholism and drug abuse is prevalent on the Bridgers side of the family. *See* Exhibit 15, at 2, ¶ 11 (Declaration of Dwight Bridgers) ("At one point in my life, I used and was addicted to alcohol and drugs… My father was also an alcoholic. Addiction and mental illness runs in our

family."); Exhibit 20, at 1, ¶ 5 (Declaration of Marie Bridgers) ("Like most of my family, I was an alcoholic…").

When Mr. Bridgers was a baby, his mother and biological father lived in a very small house with Harry Bridgers, Sr.'s family. In all, as many as sixteen people lived in the home with just one bathroom between them. S.F. Vol. 34: 27; Exhibit 20, at 1, ¶ 2 (Declaration of Marie Bridgers). Domestic violence between Linda Gorum and Harry Bridgers, Sr. occurred regularly, "once a week or twice a day." S.F. Vol. 34: 26. Ms. Gorum testified during Mr. Bridgers's trial, "I was punched in the stomach, knocked down almost, hit with shoes, throwed tables at me, lamps, knife pulled on me, tried to stab me, pulled a gun on me twice."[20] *Id*. at 27. *See also* Exhibit 15, at 1, ¶ 2 (Declaration of Dwight Bridgers) ("Linda and Harry Sr. had a verbally and physically abusive relationship."). Linda and Harry Sr.'s relationship came to an end when Harry Sr. was arrested while attempting to drive to Trenton, New Jersey, to procure drugs. Exhibit 12, at 1, ¶ 3 (Declaration of Harry Bridgers, Sr.); Exhibit 11, at 1, ¶ 1 (Declaration of William Bridgers); Exhibit 15, at 1, ¶ 2 (Declaration of Dwight Bridgers).

While Harry Sr. was incarcerated in New Jersey, Linda Gorum began a relationship with, and subsequently married, Gary Gorum, a childhood friend of Harry Sr.'s and his brothers. *Id*. Dwight Bridgers remembers Mr. Gorum "being a bully when we were kids growing up. We all played together as friends, but Gary was the worst. He would hit anyone just to hit them. He was very violent and aggressive." Exhibit 15, at 1, ¶ 3. By all accounts, even his own, Gary Gorum was physically abusive to Mr. Bridgers and his brother, even going so far at one point as to punch Mr. Bridgers in the face, severely injuring his nose. S.F. Vol. 34: 59; E.H. Vol. 2: 49-

---

[20] Mr. Bridgers's paternal grandparents likewise had an abusive relationship. Exhibit 20, at 1, ¶ 3 (Declaration of Marie Bridgers).

52, 229; Exhibit 12, at 1, ¶ 7 (Declaration of Harry Bridgers, Sr.). According to William Bridgers, III,

> Gary would beat the kids with his fist. It is one thing to use a belt or paddle, but the cruelest thing a man could do is to connect his fist to a child's face and body. I recall that Allen's nose was broken by Gary, but I don't remember if he ever went to the hospital.

Exhibit 11, at 1, ¶ 3. When Linda Gorum attempted to intervene during this beating, Mr. Gorum hit her with a vase. S.F. Vol. 34: 60.

Mr. Gorum would use belts, cords, and switches on the children weekly; the beatings inflicted were so severe that they drew blood and left marks on them, including "[b]ruises, busted mouth[s], [and] swollen eyes." S.F. Vol. 34: 58-59; E.H. Vol. 2: 51. *See also* Exhibit 15, at 1, ¶ 3 (Declaration of Dwight Bridgers) ("Gary was also very abusive towards Allen and Harry Jr., and he usually carried around a gun or knives. Gary also hit the kids with a bat."). He was strict both in discipline and control, constantly maintaining the children "on punishment" and refusing to permit them to leave the house:

> The environment Allen and Harry Jr. grew up in was completely unhealthy for the kids. They were always kept on punishment. Allen and Harry Jr. would call their grandma to say that Gary was beating them, but they weren't allowed to come over. Gary was mentally abusive as well as physically abusive. He would yell at the kids and curse at them even when they hadn't done anything wrong.

Exhibit 15, at 1, ¶ 5 (Declaration of Dwight Bridgers). It is therefore unsurprising that, to this day, Mr. Bridgers lives in abject fear of his step-father, to the point that the documentary record is littered with Mr. Bridgers's reports of hearing his step-father's voice telling him he is worthless and commanding him to kill himself. *See, e.g.,* Exhibit 10, at 25 (Eastern State Hospital records) ("He claims he hears the voice of his step-father who abused him as a youngster, telling him that he is no good and to do away with himself.").

Finally, as detailed in the preceding section, Mr. Bridgers's biological father, who was Mr. Bridgers's care-giver when he was a small child and again for a short period of time as an adolescent, was impaired and is most likely mentally retarded. Harry Bridgers, Sr. "didn't have the patience to treat Allen like a child" and "got frustrated with him and yelled at him a lot." Exhibit 12, at 1, ¶ 8.

> I wish I could have taken better care of Allen. I never had anything good to say about him. I called him stupid and a retard. When I did that, Allen just got a blank look on his face but would not get mad. He was polite even when I said mean things to him. I just got so upset that my son acted like a child. I didn't have the time to baby-sit a grown man.

*Id.*, at 2, ¶ 10.

### 3. Behavioral Risk Factors.

Prenatal parental drug use, prenatal parental alcohol use, prenatal parental smoking, prenatal parental immaturity, postnatal child abuse, postnatal domestic violence, and postnatal social deprivation are all behavioral risk factors for mental retardation that were present during Mr. Bridgers's developmental period. *See* Exhibit18. The evidence of pervasive prenatal parental drug and narcotics abuse and postnatal domestic violence in the Bridgers' household before and after Mr. Bridgers's birth is described in the previous section. Also described in that section is how Mr. Bridgers's mother smoked tobacco consistently while pregnant with Mr. Bridgers. Finally, significant social deprivation was caused by Gary Gorum's strict discipline and desire to maintain tight control over the children.

### 4. Educational Risk Factors.

Parental cognitive disability without supports, lack of preparation for parenthood, impaired parenting, delayed diagnosis, inadequate early intervention services, inadequate special education services, and inadequate family support are all educational risk factors for mental

retardation that affected Mr. Bridgers. As discussed, supra, Mr. Bridgers's parents were hardly prepared to have a child. Ms. Gorum was but sixteen years old, and Harry Bridgers, Sr., who labored under a cognitive and developmental disability, was abusing heroin and other drugs and had no means to support a child. This state of affairs naturally led to impaired parenting.

Mr. Bridgers's mental retardation was completely missed by his public schools and the one attempt to undertake a comprehensive evaluation of his functioning was fatally flawed by a misinterpreted intelligence test. See Exhibit 5 (Affidavit of Mark Cunningham); Exhibit 17 (Declaration of Daniel J. Reschly, Ph.D.). Thus, while he was placed in special education and received special education services, his misdiagnosis as learning disabled instead of mentally retarded caused him to be given inadequate special education and intervention services. Moreover, due to minority overrepresentation in special education programs for students with MMR during this time period in particular, schools were under intense pressure to avoid diagnosing African-American children with mental retardation, often opting for diagnosis as learning disabled as a substitute. According to Dr. Reschly, who has written extensively on the subject:

> The use of the diagnosis of mild mental retardation (MMR) has declined over the last 30 years. From 1976 to 2004 the prevalence of MMR in school settings declined from approximately 970,000 to 555,000, slightly less than 571,000, a decline of 43% (www.ideadata.gov). Schools increasingly became reluctant to diagnose MMR even with persons who were clearly eligible on relevant criteria (MacMillan, Gresham, Siperstein, & Bocian, 1996; MacMillan & Siperstein, 2002). Reasons for this reluctance are many, including the availability of the alternative diagnosis of specific learning disability (SLD), which has fewer negative connotations (Gresham, MacMillan, & Bocian, 1998; Reschly, 1988; Reschly, Kicklighter, & McKee, 1988a, 1988b). Another significant influence was litigation and legislation regarding minority overrepresentation in special education programs for students with MMR. MMR overrepresentation in special education was regarded in several court cases as a violation of constitutional and statutory rights (*e. g., Larry P. v Riles*, 1979). States and school districts were required by the courts to eliminate minority MMR overrepresentation, leading to declassification or reclassification of students from MMR to SLD and other

special education categories. The avoidance of the MMR was apparent in the State of Virginia where Mr. Bridgers attended public schools.

*See* Exhibit 17, at 13-14.  The fault for Mr. Bridgers's failure to receive adequate services, however, lies partially with his parents, who moved Mr. Bridgers from school to school so often that he attended *six* different elementary schools in *three* different school districts over a seven-year period.  Although the school was required by federal law to reevaluate Mr. Bridgers in 1984, this reevaluation apparently never took place.

> Mr. Bridgers' special education disability status had to be re-evaluated in 1984 as required by the federal *Education of the Handicapped Act* (1975), now called the *Individuals with Disabilities Education Act* (2004). The triennial re-evaluation of students in special education has been required since 1975. The results of this re-evaluation have not been located, likely due to the destruction of school records. It also is possible that the re-evaluation was not completed because of Mr. Bridger's frequent school changes. The frequent changes in schools and school districts does not in any way relieve the obligation to conduct the re-evaluation, but may explain why it could have been overlooked.

*Id*. at 14-15.  Suffice it to say, the presence of so many educational risk factors in Mr. Bridgers's life is likely a contributing cause to his mental retardation.

### E. Courts Have Granted *Atkins* Relief to Petitioners with Qualitatively Indistinguishable Evidence.

A comparison to cases in which district courts have granted Atkins relief—including cases in Texas—is useful.  Such a comparison reflects that the evidence marshaled by Mr. Bridgers in this petition is qualitatively indistinguishable from evidence upon which other courts have granted relief.  For this reason, relief should be granted here.

Jose Rivera is a death-sentenced person in Texas that was determined to be mentally retarded by a federal district court in Texas—a decision recently upheld on its merits by the Fifth Circuit.  See Rivera had reported IQ scores of 68, 85, 92, and 80.  The 80 IQ score was "on a short form WAIS-R," the same test given to Mr. Bridgers by Dr. Gilhousen on which Mr.

Bridgers scored a 75.  *See* Memorandum Opinion and Order, *Rivera v. Dretke*, No. B-03-cv-00139, at *39 (S.D. Tex. Mar. 31, 2006) [hereinafter "Rivera Memorandum Opinion"] (attached as Exhibit 21).  Mr. Bridgers therefore scored five points **lower** on the short form WAIS-R administered by TDCJ's prison psychologist than did Rivera, who has been adjudicated mentally retarded.  *See also* Exhibit G to Respondent's Answer to Petitioner's Post-Show Cause Hearing Brief, *Rivera v. Dretke*, No. B-03-cv-00139 (Affidavit of Stephen R. Gilliland, M.S., L.P.C.) (attached herein as Exhibit 22).  Moreover, **no** reported score for Mr. Bridgers is higher than an 80 (1981 WISC-R), and the reliability of that test as a measure of Mr. Bridgers' intellectual functioning is seriously called into question both by the competence of its administrator (who mis-scored it) and its having been administered prior to Mr. Bridgers' auto-pedestrian accident.

Despite these scores, the district court in *Rivera* nevertheless found that "when taken as a whole, [Rivera's scores] display a picture of an individual who is, at best, of borderline intelligence" and that, given this, "Rivera has satisfied his burden and has proven himself to be mentally retarded as per the 1992 AAMR definition of mental retardation."  Rivera Memorandum Opinion, at 50.

Comparisons between Rivera and Mr. Bridgers extend to adaptive functioning.  The district court in *Rivera* noted, for example, that Rivera "reads books in English."  *Id.* at 32.  Rivera also had an "extensive history of abusing inhalants" and an "extensive criminal history."  Moreover, Rivera, like Mr. Bridgers, "was never diagnosed as mentally retarded."  *Id.* at 40.  The Director had argued in *Rivera*, as they do here, that Rivera could not be mentally retarded because he "did not incur any specific problem growing up that cannot be explained by his almost constant drug abuse," because he "keeps his cell neat and clean, he orders from the commissary and can calculate costs and prices, he reads books, and lives overall an ordered life."

*Id.* at 40, 41. These arguments were rightfully dismissed, based as they are upon a pernicious stereotype of mental retardation.

Unlike Mr. Bridgers, however, Rivera "was never placed in special education classes." *Id.* By contrast, Mr. Bridgers, although he was misdiagnosed, *was* placed in special education after having repeated the second grade for a third time, and he was retained in special education through the remainder of his academic life. The district court in *Rivera* correctly rejected the Director's arguments, rooted as they are upon a pernicious stereotype about mental retardation.

In *United States v. Davis*, ___ F.Supp.2d, ___, 2009 WL 1117401, at *20, 2009 U.S. Dist. LEXIS 34707, at *60 (D. Md. Apr. 24, 2009) (attached as Exhibit 23), a federal district court in Maryland determined Earl Davis to have mental retardation, thereby precluding the death penalty as punishment. Davis's range of IQ scores is similar to Mr. Bridgers. The following chart is reproduced from the district court's opinion and reflects the tests, dates of administration, and Flynn-effect adjusted IQ scores the *Davis* court considered:

| Test | Date of Admin. | Davis' Age | Full Scale IQ | Date of Test Publication | Flynn Adjusted IQ |
|------|------|------|------|------|------|
| Wechsler Intelligence Scale for Children (WISC) | 1982 | 12 | 75 | 1949 | 66 |
| Wechsler Adult Intelligence Scale-Revised (WAIS-R) | 1992 | 22 | 76 | 1981 | 73 |
| Wechsler Adult Intelligence Scale-III (WAIS-III) | 2006 | 36 | 65 | 1997 | 62 |
| Wechsler Adult Intelligence Scale-IV (WAIS-IV) | 2009 | 38 | 70 | 2008 | 70 |

*See Davis*, 2009 WL 1117401, at *5. With the lone exception of Mr. Bridgers's pre-accident and mis-scored 1981 WISC-R exam that was administered by an unlicensed psychologist, Davis's Flynn-adjusted IQ score of 73 is higher than any Flynn-adjusted score obtained by Mr. Bridgers.

Based on these scores, the *Davis* court determined that Davis possessed significant limitations in intellectual functioning.

Like Rivera, Davis's adaptive functioning also paralleled Mr. Bridgers's adaptive functioning in many ways. Looking at his deficits, the *Davis* court wrote:

> The defendant has limited cooking abilities. He may be able to cook a grilled cheese or something in the microwave (if he only has to push one button), but he was unable to explain to Dr. Woods how to cook scrambled eggs beyond cracking an egg and putting it in a pan. Davis could shop at a grocery store, but only bought simple things he recognized, like chicken or ketchup. He has never lived by himself, always residing with his parents, wife, or girlfriends. There was no evidence that he has ever demonstrated the ability to budget or keep a daily schedule. There are even some reports of him having difficulty navigating his own neighborhood as a child. Dr. Olley reported that reports of the defendant's home living skills were "uniformly low," with the exception of one former girlfriend, Necia Brown.

*Id*. at 28. The Court held Davis was significantly impaired in this home-living domain despite that "the defendant is able to manage his personal finances (i.e., his commissary account) at the jail, that he has used money orders and debit cards in the past, opened bank accounts and used debit cards in his own name, and is able to remember whether a particular transaction is occurring under his own name or one of his aliases." *Id*. at 29. Moreover, Davis "has lived outside his family home since he was a teenager and fathered three children with three different women. He can maintain more than one romantic relationship at a time without the women's knowledge and purchase items for his children." *Id*. By contrast, the evidence reflects Mr. Bridgers never did and was unable to open bank accounts or use debit cards in his own name, and that he was unable to maintain multiple romantic relationships.

Davis's spotty work history was likewise similar to Mr. Bridgers:

> The defendant is 38 years old, but has extremely limited experience with competitive employment. He once worked for three months at the John Akridge Company performing routine custodial duties, but left because he claimed he was unable to complete tasks that required reading, such as filling out forms. A senior

engineer at the company informed Dr. Olley that no reading was required beyond punching a time clock and filling out a time sheet every two weeks.

In 1992, he briefly attended job training at the Kennedy Institute in Washington, D.C. where he was learning custodial tasks, but did not complete the program. Necia Brown reported that Davis worked at his uncle's garage doing body work on cars, but the uncle did not confirm this when he was contacted by Dr. Woods. The defendant displayed little job-finding skills, and seemed to rely on friends and family to locate jobs for him. As a child, the defendant had a paper route, but both his parents and brother reported that he needed help from his brother to complete it, because he could not reliably remember where the papers should be delivered.

*Id*. at 30. That Davis "was able to manage a mid-level drug operation" did not preclude the court's finding that Davis possessed significant limitations in his occupational skills.

In *United States v. Shields*, No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) (Docket Entry 557) (attached as Exhibit 24), a federal district court in Tennessee recently determined the defendant to be mentally retarded even though he obtained an IQ score of 93—in the normal range—on a Leiter intelligence test in kindergarten. Also like Mr. Bridgers, Shields was diagnosed by school evaluators as learning disabled and not mentally retarded:

Defendant continued to display academic and behavioral problems in school. At one point, Defendant and his brother were not allowed to ride the school bus because of their propensity for disruptions, and it became necessary when Defendant was about age 11 for his mother to sit with him in class in order to control him. He also displayed a need for individualized attention and instructions to keep him on task as he was not able to stay focused otherwise; nor was he able to work independently. An individualized education plan was developed by the school system, and Defendant was deemed to have a specific learning disability— not mental retardation. He received some special education classes for learning disabilities in his lower grades, but he was also "mainstreamed" into certain other regular classes. Defendant's fifth grade teacher, Rachel Marquez, noted that Defendant's academic performance was very much below that of the other students in her class and that while Defendant's "reading recognition level is early second grade[] . . . his comprehension level is below that." Defendant did progress and develop some academic skills, but he did not develop those that would put him on par with his peers. Rather Defendant's academic performance was consistent with a child possessing mental deficiencies. Despite continual difficulties in achievement and IQ scores that would be potentially suggestive of mental retardation, school officials never labeled Defendant as mentally retarded.

*Id.*, at *14-*15 (internal citations omitted). Shields's work history and dependence upon others likewise echos the evidence Mr. Bridgers has presented above:

> Defendant possesses a record of intermittent employment in low-skilled jobs characterized by simple and/or repetitive tasks. This work history includes jobs as, among other things, a restaurant dish washer and a furniture mover. Defendant had difficulty in maintaining even these positions, and he was never able to become a successful and effective member of the workforce. Defendant's inability to master the functional job skills taught in his high school curriculum strongly evidences that his poor employment history is fundamentally attributable not to a lack of effort on his part but rather to his lacking the ability to perform even the most basic vocational skills required to succeed in the vast majority of jobs.

> With respect to living arrangements, Defendant has always depended on a woman benefactor. After living with his mother, Defendant was married and lived with his wife and then subsequently with his girlfriend, Ms. Leavy. Defendant has never lived on his own, and he possesses difficulty in completing certain household tasks. For example, Defendant can only prepare simple meals and cannot follow a recipe or measure foods. Furthermore, it appears that Defendant could go to the grocery store to buy food for the household provided he had a list to follow or had someone to assist him. The evidence shows as well that Defendant is someone who has always had difficulty following directions and staying on task, and even as an adult he has had no apparent ambition or goals in life. …

> While in jail awaiting trial, Defendant has completed "copout" forms by which he, like other inmates, has made simple requests for supplies and services. Defendant has also written letters, sent artwork to family, filed a lawsuit, and made a Freedom of Information Act request from jail. The evidence strongly suggests, however, that Defendant has received assistance from other inmates in performing many, if not all, of these activities.

*Id.*, at *17, *18 (footnotes and internal citations omitted).

The evidence Mr. Bridgers has presented herein paints a picture of a person with mild mental retardation that is qualitatively indistinguishable from the evidence painstakingly considered and presented by district courts that have found persons to be mentally retarded pursuant to *Atkins*.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Bridgers prays that this Court:

1.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2.  If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Mr. Bridgers may present evidence in support of his claim;

2.  Grant such other relief as law and justice require.

Respectfully submitted,


s/ David R. Dow
_____

David R. Dow
Texas Bar No. 06064900

Jared Tyler
Texas Bar No. 24042073

TEXAS DEFENDER SERVICE
412 Main St., Suite 1150
Houston, Texas 77002
TEL: (713) 222-7788
FAX: (713) 222-0260

*Counsel for Allen Bridgers*

## VERIFICATION

I, David R. Dow, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set for in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 20, 2009.

s/ David R. Dow

_____

David R. Dow

## CERTIFICATE OF SERVICE

On May 20th, 2009, I electronically filed the forgoing pleading with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. A "Notice of Electronic Filing" was sent to Ms. Ellen Stewart-Klein, attorney of record for Respondent Quarterman, at her e-mail address: ellen.stewart-klein@oag.state.tx.us. I further certify that a motion to seal unredacted pages 50-51 and the document marked as Exhibit 19 has been filed with this Court.

s/ David R. Dow

_____

David R. Dow